UNITED STATES of America, Appellee,

v.

William H. NICHOLS,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Lea RICARD, Defendant, Appellant.

Nos. 86–1551, 86–1552.

United States Court of Appeals,
First Circuit.

Argued Dec. 4, 1986.

Decided June 3, 1987.

James D. St. Clair with whom Robert D. Keefe, Robyn B. Klinger and Hale and Dorr, Boston, Mass., were on brief, for William H. Nichols.

Charles J. Rogers, Jr., Providence, R.I., for Lea Ricard.

Daniel I. Small, Asst. U.S. Atty., with whom Robert S. Mueller, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This appeal arises from the conviction of William Nichols of theft of government property and conspiracy to commit theft of government property and the conviction of Lea Ricard of conspiracy. See 18 U.S.C. §§ 371, 641. Both defendants challenge the sufficiency of the evidence against them. In addition, William Nichols challenges a jury instruction, the giving of a modified *Allen* charge, and an evidentiary ruling. We affirm.

I. *Background*

A. *Setting the TECS Trap*

In the summer of 1980, U.S. Customs officials laid a trap to test their suspicion that Customs law enforcement information was being used for unauthorized purposes. They inserted a fictitious record—of a 1984 Jaguar owned by a Frank Kramer that had been seized by Customs at Niagara Falls—into the Treasury Enforcement Communications Systems ("TECS"), the Customs Service's law enforcement computer system. They then hired a private investigator from New Hampshire, Ira Cook, to attempt to obtain that information.

At Custom's direction, Cook called the Cranston, Rhode Island, police department to ask for a referral to a private investigator. The dispatcher referred him to the Galaxie Agency, which was owned and operated by Lea Ricard, the wife of Cranston police captain Ray Ricard. Cook called Galaxie and told Lea Ricard he had a client with a domestic problem who was trying to find her husband's 1984 Jaguar. Cook represented that his client thought it might be hidden in an apartment complex in Cranston, but her husband, Frank Kramer, said it had been seized by Customs.

Lea Ricard agreed to work on the case for $20 an hour. She searched several apartment complexes with no luck and then called Cook back on August 26, 1980 to report her results. During that call she volunteered that she had a friend at Customs in Boston who might be able to find out if the car had been seized. Cook excused himself, hung up, attached a tape recorder to the phone and called back. He taped this and all following conversations with Lea Ricard. On tape, Ricard stated that she was not sure her contact, whom she refused to name, could find out, but that if he could, he would be "very expensive."

B. *The Trap is Sprung*

On September 4, Ricard informed Cook that her contact was "working on it." She could not say how much the information would cost, other than that the contact "couldn't talk about it because he is not allowed to accept money legally.... You know, for doing this. So just by the way he talked though, I know it's not going to be an exorbitant amount of money." That same day the fictitious Kramer record was queried on request of U.S. Customs Patrol Officer William Nichols.

On September 7, Cook called Ricard to see whether she had the information yet. She was out, but her husband, Ray Ricard, gave Cook the information from a note Lea Ricard had left. Ray told Cook the car had been impounded and that the cost would be "a hundred dollars for this guy." He told Cook that "the rest of the note said that the guy is ultra-paranoid, extremely concerned he does not get involved, please make that clear."

Cook spoke to Lea Ricard on September 10, when she confirmed that the car was seized and told him that the place to get more information was the U.S. Attorney's Office in Buffalo, New York. She explained that the information was so cryptic because her contact is "not really supposed to be giving out this information" and "he tries to talk in circles and hope you pick up on everything he is saying." She continued, "You know he is very, very paranoid about this. And I don't blame him. You know it's his job and he doesn't want to lose his job just checking out something for

somebody he doesn't even know." Ricard then sent Cook a bill that included a $100 charge for "confidential information." Cook paid the bill with a check, which Ricard deposited on October 19. On November 1 Lea Ricard wrote a Galaxie Agency check for $50 to Laurie Nichols, William Nichols' wife, and gave it to William Nichols in return for the Kramer information. Mrs. Nichols signed and cashed the check the following week.

## C. Emptying the Trap

Customs Internal Affairs Agents went to the Ricards' home on November 26, 1980, with a search warrant. At first, the Ricards denied any knowledge of the Kramer Jaguar. But when the agents played excerpts of the tapes, the Ricards partially admitted their involvement.

Internal Affairs then interviewed William Nichols under oath on December 3. He denied having given TECS information to private individuals, and only admitted the story in pieces after being told of the tapes and other evidence. He signed his completed statement without mention of the $50 check to Laurie Nichols. When the agents confronted him with their knowledge of the check, he amended his statement and signed it again.

The grand jury subsequently returned an indictment against Nichols and the Ricards, charging them with conspiracy in the theft of government property (18 U.S.C. §§ 371 and 641) and bribery (18 U.S.C. §§ 201(b) and (c)) and charging Nichols with theft of government property (18 U.S.C. § 641). At the end of a six day trial the district court directed a verdict of acquittal on the bribery count for Ray Ricard. The jury then found Nichols and Lea Ricard guilty on the conspiracy count, found Nichols guilty on the theft count, acquitted Ray Ricard of conspiracy, and acquitted all three of bribery.

## II. Discussion

Nichols challenges the district court's exclusion of evidence that he claims would show that the TECS trap was set in retaliation for his investigation of the Cranston, Rhode Island, police department. He also challenges two of the trial court's charges

to the jury, one regarding theft of government property and another regarding a deadlocked jury (the modified *Allen* charge). Both Nichols and Lea Ricard challenge the court's denial of their motions for acquittal. We examine each alleged error in turn.

### A. Evidence of Retaliation

■ One of Nichols' primary defense theories was that Customs set him up in retaliation for violating the "rules of the game." He had independently investigated a Captain of the Cranston Police Department, who was allegedly selling counterfeit Rolex watches. This investigation caused friction between Customs and the Rhode Island police and earned Nichols a reprimand from his superiors for conducting an investigation without Custom's approval. Nichols claimed that this evidence would show him to be an aggressive law enforcement officer who was attacked for investigating another law enforcement officer.

The problem with this theory is that the reasons behind the setting of the TECS trap are irrelevant to whether Nichols fell into it. The only question before the jury was whether he did the things he was charged with, *i.e.*, conspiring to and then giving the government information to Lea Ricard. Nichols did not raise an entrapment defense, nor did he move to dismiss the indictment on the grounds of vindictive prosecution. Under Fed.R.Evid. 402, "[e]vidence which is not relevant is not admissible." Even if the Cranston Police investigation had been marginally relevant however, the time and effort needed to evaluate Nichols' claim would have diverted the jury from the real issues in this case. The exclusion of this evidence was within the trial court's discretion. *See United States v. Jarabek*, 726 F.2d 889, 902 (1st Cir.1984). ("[t]he very slight probative value of such evidence on the issue of bias does not overcome the strong likelihood of confusion on the central issues in the case and undue delay in the trial.").

### B. The Charge to the Jury on Theft of Government Property

■ Nichols claims that the trial court did not properly instruct the jury on the

intent necessary to commit theft of government property. 18 U.S.C. § 641. Although he acknowledges that the court instructed the jury on the intent necessary to commit the crimes charged as a general matter,[1] he argues that the failure to explain the necessary intent when discussing theft specifically is reversible error.

This argument might have merit if the general discussion of intent that preceded the instruction on the theft count had not been so thorough. The court clearly stated that this intent was a necessary element of each of the charges. The judge then flagged that intent requirement when he began his instruction on theft by stating that

> [c]ount 2 of the indictment charges the defendant, William Nichols, with stealing and *knowingly* converting to the use of another and selling information from the TECS computer system without authority.

(Emphasis supplied). Given the extensive instruction on "knowingly and willfully" that the judge finished moments earlier, there was no need to go into another instruction on the same subject. Jury instructions "must be viewed in the context of the overall charge." *United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.1984) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). The jury received adequate instruction on the intent necessary to commit a theft of government property.

### C. *The Modified Allen Charge*

Nichols argues that the district court's modified *Allen* charge[2] was premature and coercive. After deliberating three and a half hours one day, and over five hours the next, the jury sent a note to the judge stating they were deadlocked on all four counts. The judge recalled the jury and gave them a supplemental instruction that follows in its entirety:

In a large proportion of the cases and perhaps strictly speaking in all cases absolute certainty cannot be attained nor can it be expected. Although the verdict to which a juror agrees must, of course, be his own verdict or her own verdict, the result of his or her own convictions, and not a mere acquiescence in the conclusion of his or her fellow jurors, yet, in order to bring 12 minds to a unanimous result you must examine the questions submitted to you with candor and with the proper regard and deference to the opinions of each other. You should consider that you are selected in the same manner and from the same source from which any future jury must be selected. There is no reason to suppose that this case will ever be submitted to 12 men and women more intelligent, more impartial or more competent to decide it or that more or clearer evidence will be produced on one side or the other, and with this view it is your duty to decide the case, if you can consciously do so without violence to your individual judgment.

In the event you cannot so decide, a jury has a right to fail to agree. In order to make a decision more practical the law imposes the burden of proof on one party or the other in all cases. The high burden of proof which must be sustained by the prosecution has not changed. In the present case the burden of proof is on the government to establish with respect to each count each essential element of the offense, and to establish that essential element beyond a reasonable doubt. And if with respect to any element of any count you are left in reasonable doubt, the defendant is entitled to the benefit of such doubt and

---

1. The judge instructed the jury in part that: with regard to all four counts there is an obligation on the government to prove that each defendant acted knowingly and willfully....

   Doing something willfully means doing it voluntarily and on purpose and with intention of either disobeying or disregarding the law. When we talk about somebody acting knowingly we mean that they are acting consciously and voluntarily and with an awareness of what they are doing.

   The complete intent instruction takes up nearly three pages of transcript.

2. *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

must be acquitted. But in conferring together you ought to pay proper respect to each other's opinions and you ought to listen with the disposition to being convinced to each other's arguments. Thus where there is a disagreement jurors favoring acquittal should consider whether a doubt in their own mind is a reasonable one when it makes no impression upon the minds of the other equally honest and equally intelligent who have heard the same evidence and with the same degree of attention and with an equal desire to arrive at the truth and under the sanction of the same oath.

On the other hand, jurors for conviction ought seriously to ask themselves whether they should doubt the correctness of a judgment which is not concurred in by others with whom they are associated and distrust the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellow jurors.

Finally, not only should jurors in the minority reexamine their positions, but jurors in the majority should also do so, to see whether they have given careful consideration and sufficient weight to the evidence which has favorably impressed the persons in disagreement with them.

Incidentally, if you are unable to reach a unanimous verdict as to all four counts, you are free to return a verdict on those counts, if any, as to which all of you agree.

I am instructing you now to go back and resume your deliberations.

This modified *Allen* charge meets the guidelines we set in *United States v. Flannery,* 451 F.2d 880, 883 (1st Cir.1971). The jury had deliberated for nearly nine hours over two days and had reported to the judge *sua sponte* that they had reached a deadlock. *See United States v. Rengifo,* 789 F.2d 975, 977, 985 (1st Cir.1986) (after seven hours deliberation the charge, given by the same judge who tried this case, was the "correct response to the information that the jury was at an impasse"). The

instruction was carefully phrased so that "(1) the onus of reexamination would not be on the minority alone ...; (2) a jury would not feel compelled to reach agreement ...; and (3) jurors would be reminded of the burden of proof." *United States v. Angiulo,* 485 F.2d 37, 39 (1st Cir.1973).[3] The fact that the jury returned its verdict late in the day and only one hour after the charge was given does not show that the charge was coercive. *See United States v. Rengifo,* 789 F.2d at 977, 985 (jury given modified *Allen* charge at 7:30 p.m., after deliberating since noon, and returned verdict two hours later).

### D. Denial of Nichols' Motion for Acquittal

■ Nichols argues that the government failed to present sufficient evidence to convict him of either conspiracy or theft of TECS information. In making this argument he focuses on the tapes and refers to them as the "only evidence" the government had. Unfortunately for Nichols however, the government had more evidence. Nichols accessed the TECS trap the same day Lea Ricard told Cook her Customs source was working on the request. Nichols told Lea Ricard that the car was seized and that the U.S. Attorney in Buffalo, New York, would have more information. Nichols told Ricard to make the check out to his wife, who cashed the check. His behavior at the Customs Internal Affairs interview permitted an inference that he had something to hide. And the jury could well have found his testimony at trial evasive, in conflict with other evidence, and lacking credibility. This evidence was more than sufficient to permit a rational trier of fact to find guilt beyond a reasonable doubt. *See United States v. Samalot-Pérez,* 767 F.2d 1, 4 (1st Cir.1985); *United States v. Beltrán,* 761 F.2d 1, 6–7 (1st Cir.1985).

### E. Denial of Lea Ricard's Motion for Acquittal

■ Lea Ricard asserts that there was no proof that she knew what she asked William Nichols to do for her was illegal.

---

**3.** The charge was so balanced that, as the government points out, Lea Ricard's counsel withdrew his objection after the charge was given, explaining that it was "sort of like saying you didn't like Chicago until you got there."

Therefore, she lacked the requisite intent to enter into a conspiracy to steal or knowingly convert government information. 18 U.S.C. §§ 371, 641. Yet her statements on tape contradict that assertion. She stated that Nichols would be "very expensive," yet that he "is not allowed to accept money legally." She told Cook that Nichols "is not really supposed to be giving out this information" and that "he is very, very paranoid about this." And she knew that Nichols would lose his job if caught. Furthermore, her behavior when confronted by Customs Internal Affairs Agents suggested consciousness of guilt. *See United States v. Parness*, 503 F.2d 430 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). The jury had sufficient evidence to find guilt beyond a reasonable doubt.

*Conclusion*

The decision of the trial court is *affirmed*.