# United States Court of Appeals
## For the First Circuit

No. 11-2489

UNITED STATES OF AMERICA,

Appellee,

v.

EFRAIN MATIAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, U.S. District Judge]

Before

Torruella, Howard and Thompson,
Circuit Judges.

Steven A. Feldman, with whom Arza Feldman and Feldman and Feldman were on brief, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

January 18, 2013

**HOWARD**, **Circuit Judge**.  After a nine-day trial, a jury in the District of Massachusetts convicted Efraín Matías of attempted possession of at least five kilograms of cocaine with the intent to distribute.[1]  He was sentenced to twenty years in prison and ten years of supervised release.  Matias presses two claims on appeal.  First, he argues that the district court erroneously allowed the prosecution to introduce evidence that after his arrest, law enforcement agents discovered roughly $45,000 in a storage locker that he rented.  Second, he asserts that the prosecutor's closing argument contained improper comments that added up to a violation of his right to a fair trial.  Finding no error, we affirm.

## I.  Factual Background

We recount the facts surrounding Matías's arrest and conviction, which are largely undisputed, in the light most consistent with the jury's verdict.  United States v. Valerio, 676 F.3d 237, 244 (1st Cir. 2012).

In late 2007, Drug Enforcement Administration ("DEA") agents in Massachusetts received word from fellow agents in California that Matías wanted to buy a large quantity of cocaine to sell in the Worcester area.  This information came from a cooperating witness in San Diego, José Luis Ruiz.  The agents in Worcester already had information that Matías was a large-scale

---

[1] See 21 U.S.C. §§ 841(b)(1)(A)(ii), 846.

marijuana trafficker.[2]  Ruiz had been involved in many of Matías's marijuana deals.

Beginning in December 2007, DEA agents monitored telephone conversations between Matías and Ruiz, during which the two discussed details of a plan for Matías to purchase cocaine.  In March 2008, Ruiz introduced Matías to DEA undercover agent Anthony Roberto -- known to Matías only as "Tony" -- who was posing as Ruiz's drug courier.  Tony and Matías eventually agreed that Tony would deliver ten kilograms of cocaine to Matías in Massachusetts.

After an aborted attempt at consummating the deal in March, Tony and Matías agreed to meet on April 15, 2008, at the Greendale Mall in Worcester, not far from Matías's house.  Tony told Matías that he and another man (undercover DEA Agent Paul Gazzara) would bring nineteen kilograms of cocaine, with an asking price of $17,000 per kilogram.  DEA agents conducting surveillance saw Matías drive into the mall parking lot and then briefly meet with Tony inside the mall.  Gazzara arrived in an undercover DEA van to meet the pair after they emerged from inside the mall.  The van contained ersatz cocaine that was packaged to look authentic and stored in a hidden compartment.  Matías looked inside the van, and, apparently satisfied, told Tony that he was going to get the

---

[2] Less than a year after his indictment in this case, Matías was indicted on marijuana trafficking charges.  He pled guilty, was sentenced to 240 months' imprisonment to be served concurrently with his sentence here, and later dismissed his appeal.

money to make the purchase later that day at the same mall.  A few hours later, Matías returned to the Greendale Mall, albeit in a different vehicle.  Upon meeting up with Tony, Matías told him that he only wanted to buy one kilogram of cocaine, test it, and then purchase the remaining eighteen kilos if he liked the test results.  Tony refused those terms and the deal was, for the time being, scrapped.

Despite the uncompleted April deal, Matías continued discussions with Ruiz about buying cocaine.  Eventually, Ruiz agreed to drive from California to Massachusetts with cocaine to make the deal personally with Matías.  On June 25, 2008, Ruiz, along with his "supplier" (in reality undercover DEA agent Raphael Romero) met with Matías in an Auburn, Massachusetts, restaurant.  Matías agreed to buy twenty-two kilograms of cocaine.  He was to pay $18,000 per kilogram for the first ten kilograms, and $17,500 each for the remaining twelve.  Romero agreed to a cash payment for the first ten kilograms, and to "front" Matías the rest, with payment to be made within three days.  Matías told Romero that he would likely pay the remainder sooner, because he expected to re-sell the cocaine quickly.  He also spoke of future deals with Romero.  They agreed to complete the deal later that day at a nearby hotel where Ruiz and Romero were staying.

After the meeting, Matías switched into a different car and drove home.  He eventually drove to a clothing store that he

owned, later emerging with two plastic bags that each contained a shoebox full of cash. He then met Ruiz and Romero at a Starbucks café near their hotel. Matías gave Romero a suitcase that he had retrieved from his car, which contained over $214,000, considerably more than the $180,000 that Romero was expecting to receive. Matías explained that he preferred to pay for twelve kilograms immediately, so that he would only owe Romero for the remaining ten kilograms. Upon seeing the money, Romero signaled to other DEA agents, who promptly arrested Matías.

Following the arrest, DEA agents executed search warrants at Matías's clothing store and at a storage locker that Matías rented in Sterling, Massachusetts, a town roughly fifteen miles from Worcester. They found approximately $45,000 in cash in the storage locker. Matías has never disputed that he rented the locker and that the cash belonged to him.

Prior to trial, Matías gave notice that he would assert an entrapment defense. Matías claimed that he only got involved in a cocaine deal -- as opposed to his usual practice of dealing only marijuana -- because Ruiz had plied him with a story that Ruiz and his family faced violent retribution from a drug associate after a robbery.

## II.  The Cash in the Storage Locker

At trial, in addition to the government's evidence about the seizure of cash from the storage locker, Matías testified in

his own defense, and conceded that the money seized from the storage locker was his. He also admitted that cash had been seized from him before, and that he used storage lockers to hide drug proceeds from law enforcement.

At the close of evidence, the trial judge ruled that the evidence of Matías's marijuana dealing -- including the storage locker cash -- was relevant to rebut the entrapment defense, as it was probative of Matías's predisposition to engage in the charged crime. See United States v. Djokich, 693 F.3d 37, 47 (1st Cir. 2012) ("After the defendant has made [a] threshold showing, the burden shifts to the government to prove . . . that either the defendant was not wrongfully induced or the defendant had a predisposition to engage in such conduct absent the inducement.").[3]

On appeal, Matías first argues that the seized money was not relevant to the charged cocaine crime. We review this evidentiary claim for abuse of discretion. United States v. Polanco, 634 F.3d 39, 44 (1st Cir. 2011).[4] "Relevant evidence" is that which has "any tendency to make the existence of any fact that

_____

[3] Matías places weight on the district court's additional finding that the cash was not an "instrumentality" of the charged crime. That finding, however, came in the context of a forfeiture claim asserted by the government and is not germane to the substantive cocaine charge at issue here.

[4] The government argues that Matías did not preserve this claim of error, and that we should therefore review for plain error only. We need not resolve this issue, as Matías's claim of error also fails under the more generous abuse of discretion standard as well.

is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. There was no abuse of discretion in the district court's observation that the large sum of cash secreted in the storage locker was relevant to his ability "to consummate the transaction." Given that Matías seemingly owed Ruiz $175,000 to complete the cocaine deal, the large sum of money stored in the locker was probative of the charged crime because it reflected Matías's ability to engage in substantial cash transactions. This evidence of his capacity to engage in large-scale drug transactions, in combination with the other evidence of his familiarity with and participation in drug trafficking, was thus relevant, at a minimum, to the government's meeting its burden of establishing predisposition. In addition, the storage of the cash, which fit with Matías's admission that, as a trafficker he used storage lockers to hide drug proceeds, undercuts Matías's argument that the district court's reasoning opens the door to the government relying on a defendant's possession of any large sum of money as evidence of guilt.[5]

Next, although he does not cite to Federal Rule of Evidence 403 -- and did not do so below -- Matías also argues that

---

[5] Although Matías's brief contains single references to "prior bad acts" evidence and his "Fourteenth Amendment due process right to a fair trial," they are unaccompanied by any developed argument and thus these grounds are also waived.

the admission of the storage locker evidence unfairly prejudiced him because it left the jury to speculate that he was a drug dealer based on his past, without proof of the pending cocaine charges against him. This argument fails because the proof of Matías's involvement in the charged crime was overwhelming, with recorded phone conversations and face-to-face meetings between the defendant and Ruiz, Roberto, Gazzara and Romero. Moreover, Matías conceded during his own testimony that he was a drug dealer. In light of this evidence, there was little risk of unfair prejudice in the admission of the cash seized from Matías's storage locker.

## III. Prosecutor's Closing Argument

Matías claims on appeal that several statements within the government's closing argument were improperly prejudicial and violated his right to a fair trial. We review de novo whether the prosecutor's remarks were improper, United States v. Appolon, 695 F.3d 44, 65 (1st Cir. 2009), but to constitute reversible error, the remarks had to be both inappropriate and prejudicial. United States v. De La Paz-Rentis, 613 F.3d 18, 25 n.2 (1st Cir. 2010). The degree of prejudice depends on "the totality of the circumstances, including the severity of the misconduct, the prosecutor's purpose in making the statement (i.e., whether the statement was willful or inadvertent), the weight of the evidence supporting the verdict, jury instructions, and curative

instructions." Id. (quoting United States v. Glover, 558 F.3d 71, 76 (1st Cir. 2009)).

Referring to Matías's entrapment defense, the prosecutor posed two rhetorical questions to the jury: 1) "[W]hen you consider predisposition, if somebody -- tomorrow morning you wake up -- drops 22 kilograms of cocaine on your front doorstep, would you have any idea how to distribute it?"; and 2) "Have you ever wrapped money in dryer sheets?" Matías argues that both statements improperly permitted the jurors to substitute their own personal experiences for the government's burden of proving its case beyond a reasonable doubt. We disagree.

Matías cites no authority to support this claim, and we note that it does not qualify as a so-called "Golden Rule" argument, in which a prosecutor improperly suggests to jurors that they put themselves in the shoes of a victim. See United States v. Kirvan, Inc., 997 F.2d 963, 964 (1st Cir. 1993) (observing that "golden rule" cases do not apply where jurors are asked to put themselves in place of an eyewitness in order to reconstruct a scene). Nor did the prosecutor "encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." United States v. Moreno, 947 F.2d 7, 8 (1st Cir. 1991) (quotation marks omitted) (observing that asking jurors to put themselves in defendant's place to assess veracity of claim that she was unaware of roommate's drug dealing

was an appropriate appeal to common sense in weighing all the evidence).

Viewed in their proper context, the comments were not improper. The prosecutor asked the jurors to use common sense judgment in response to Matías's defense that he was entrapped -- a defense which necessarily requires a finding that he was not predisposed to commit the charged crime. As such, the government was entitled to illustrate the implausibility that a person who bought twenty-two kilograms of cocaine which he said he could quickly sell, and who understood the drug trade to the extent that he had previously wrapped drug money in dryer sheets to conceal any odor, was not predisposed to engage in the alleged transaction. See, e.g., United States v. Abreu, 952 F.2d 1458, 1470-71 (1st Cir. 1992) (finding no impropriety where prosecutor rhetorically asked during closing, "When you left your house this morning, did you leave $23,000 on the bed? Did you leave $2,500 in the headboard of your bed? Did you leave $500 in the kitchen drawer? Did you leave $26,000 in your apartment when you left this morning?").

Next, and again without citing any authority, Matías argues that the prosecutor usurped the jury's function as the arbiter of credibility by calling Matías's version of events "an incredible story . . . it's a clever story, but it's just that, a story, because it doesn't add up" and subsequently arguing that Matías was trying to deceive the jury. This claim lacks merit.

-10-

Matías, testifying in his own defense, claimed that he was entrapped by the government, and that he only pretended to buy drugs from Ruiz because Ruiz said his family was being threatened. Where, however, as here, "a defendant puts his credibility at issue by testifying, the prosecution can comment on the implausibility of his testimony . . . ." United States v. Isler, 429 F.3d 19, 27 (1st Cir. 2005). That is what occurred. The government, in response to Matías's central theme, introduced evidence that Matías was an experienced marijuana dealer with expertise in deceiving law enforcement, who neither asked Ruiz whether his family was still in danger at the time of the twice-delayed deal nor attempted to "help" Ruiz by simply offering to cover his debt, rather than going through the ruse of a cocaine deal. Under the circumstances, the prosecutor's tack was not improper.

Matías next argues that the prosecutor improperly said that Matías portrayed himself as "a family man . . . who pumps tons and tons of marijuana into the community and a few kilograms of cocaine" and then queried the jury, "Is that a family man?" Matías argues that this was only an emotional appeal to the jury and an irrelevant ad hominem attack. But he provides neither authority nor argument to support his contention that the comment requires reversal. In light of Matías's defense -- that he had feigned interest in a drug deal because he was concerned for Ruiz's family

-- the statement was a fair comment on the inconsistency of Matías's defense and the contrary evidence about his actions.

Matías's final claim is that the prosecutor's description of Matías's defense as "insulting" warrants reversal. The comment came as the prosecutor was recounting Matías's evidence, which included testimony from his accountant about his non-drug income: "Why did he choose to call an accountant? . . . To make himself look like a legitimate businessman? I suggest to you, ladies and gentlemen that this was nothing short of deception . . . and even somewhat insulting." Although a suggestion to the jury that it should be insulted will in some circumstances have the potential to cause impermissible consideration of issues beyond the evidence, context is important. Here, Matías's defense included the possibility that his sole source of income was legitimate, even though he testified to extensive marijuana dealing. In context, the statement was not improper as a shorthand for "insulting to the jury's intelligence." See Obershaw v. Lanman, 453 F.3d 56, 66 (1st Cir. 2006) (holding, in a habeas proceeding, that prosecution's statement during summation that a defense claim was "an insult to your intelligence . . . as jurors" could reasonably be seen as a comment based on the evidence where the state court described the comment as a "rhetorical flourish, undoubtedly recognizable to the jury as such." (citing Commonwealth v. Obershaw, 762 N.E.2d 276, 289 (Mass. 2002))).

**Affirmed.**