# United States Court of Appeals
## For the First Circuit

No. 14-2065

UNITED STATES OF AMERICA,

Appellee,

v.

RICARDO AMARO-SANTIAGO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, Jr., U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Luis Angel Guzman-Dupont argued, with whom Mark E. Howard and
Howard & Ruoff, PLLC, were on brief, for appellant.
Nina Goodman, Attorney, Appellate Section, Criminal Division,
U.S. Department of Justice, with whom Leslie R. Caldwell, Assistant
Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General,
Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson
Pérez-Sosa, Assistant United States Attorney, were on brief, for
appellee.

May 31, 2016

**BARRON**, **Circuit Judge**.  Ricardo Amaro-Santiago was convicted, after a jury trial, of drug and weapons offenses committed in connection with the Federal Bureau of Investigation's Operation Guard Shack, which targeted corrupt Puerto Rico police officers.  The District Court sentenced Amaro, who was not himself a police officer, to fifteen years in prison.  Amaro challenges his convictions and his sentence.  We affirm.

I.

Operation Guard Shack began in 2008.  It focused on Puerto Rico police officers who were suspected of accepting money from drug dealers in exchange for providing security during drug transactions.

In May 28, 2010, as part of that operation, the FBI conducted the sting operation that led to Amaro's arrest.  The sting took place at an apartment in Guaynabo, Puerto Rico.  It involved a staged drug deal (using sham cocaine) in which Amaro was claimed to have participated -- along with two police officers -- by acting as an armed guard.  The FBI audio and video recorded the deal.

At trial, Amaro put on a duress defense and took the stand to make his case.  Amaro testified that he needed $400 to fix his car and that a co-worker had suggested that Amaro might be able to borrow the money from her cousin, who was a police officer.  Amaro testified that he met with that officer, but the officer

said he did not "have the money right now." Amaro said he went with the officer and a second officer to the apartment where the drug transaction took place because he thought they were going there to collect $400 for Amaro and not to provide security for a drug transaction. Amaro testified that he stayed at the apartment and helped with the drug transaction only because, when he tried to leave the apartment, the FBI agent posing as the drug dealer made a comment to him that made him think the drug dealer would hurt him if he tried to leave. Finally, Amaro testified that he did not report the drug transaction to the police because he was afraid for his family's safety.

Despite Amaro's testimony, the jury returned a guilty verdict on all three counts it was asked to consider: conspiracy to possess with intent to distribute cocaine in excess of five kilograms, in violation of 21 U.S.C. § 841(a)(1) and § 846, aiding and abetting the attempted possession with intent to distribute cocaine in excess of five kilograms, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and possession of a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c). The jury also found that the amount of fake cocaine involved in the first two offenses was eleven kilograms. The District Court then sentenced Amaro to fifteen years in prison. Amaro now appeals, challenging both his convictions and his sentence.

Amaro first contends that his convictions must be vacated because the prosecutor made two inappropriate statements during closing argument. The parties dispute whether Amaro objected to those statements below, and thus they disagree about whether our review should be de novo or only for plain error. But we do not need to resolve that disagreement because, even assuming that our review is de novo, each of his challenges still fails.

Under de novo review, we may reverse Amaro's convictions on the basis of the prosecutor's remarks only if they were "both inappropriate and prejudicial." United States v. Matías, 707 F.3d 1, 5 (1st Cir. 2013). To be prejudicial, "the prosecutor's remarks [must have] 'so poisoned the well that the trial's outcome was likely affected.'" United States v. Shoup, 476 F.3d 38, 43 (1st Cir. 2007) (quoting United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003)). In determining whether a statement "poisoned the well," we must consider "the totality of the circumstances, including the severity of the misconduct, the prosecutor's purpose in making the statement (i.e., whether the statement was willful or inadvertent), the weight of the evidence supporting the verdict, jury instructions, and curative instructions." Matías, 707 F.3d at 5-6 (quoting United States v. De La Paz-Rentas, 613 F.3d 18, 25 n.2 (1st Cir. 2010)). Applying those standards here, we conclude

that Amaro has not shown that the prosecutor's statements require reversal of his convictions.

## A.

Amaro first points to the prosecutor's statement in closing argument concerning a key aspect of Amaro's duress defense. The context for that statement is as follows.

During the staged drug transaction at the apartment, Amaro stated that he had left his cell phone downstairs. The FBI agent who was posing as the drug dealer said that Amaro should not be allowed to get his cell phone because he would "run away." The agent said, "He'll run away and I have the chainsaw ready for . . . any person that infiltrates in here put him dr-r-r-r-r."

At trial, Amaro testified that this comment made him feel that his "life was threatened," and so he did not leave the apartment. In his closing argument, however, the prosecutor told the jury that:

> you can't have an immediate threat that somebody's going to chop you up with a chain saw if there's not even a chain saw in the room. And there's no evidence that there was a chain saw anywhere in that apartment. And to be clear, to meet this element of the duress defense, that's the defendant's burden. He has to put some evidence to you and prove that by a preponderance of the evidence that the threat was immediate, that there was a chain saw available for these people to chop him up.

Amaro argues that this statement improperly informed the jury that, as a legal matter, the chainsaw remark could not support a key element of his duress defense -- that the threat be an "immediate threat of serious bodily injury."  United States v. Bravo, 489 F.3d 1, 10 (1st Cir. 2007).  But although Amaro is right that the jury could have found that he felt immediately threatened as a result of the agent's statements regarding the chainsaw even though there was no chainsaw in the room, the prosecutor's problematic statement does not warrant reversal.

As troubling as the prosecutor's misstatement of the law of duress is, the District Court's instruction the next morning sufficed to cure any concern that the prosecutor's statement misled the jury.  In the curative instruction, the District Court properly restated the elements of duress, and then added the following comments that directly addressed what the prosecutor had said regarding the chainsaw:

> Now, let me note that in this case -- and we've been here for seven, this is the eighth day -- the prosecutor for the Government in his closing argument stated that to meet the duress defense -- and I will quote, "Mr. Amaro had to prove that the threat was immediate and that there was a chain saw and that there was a chain saw available for these people to chop him up."  And that was the prosecutor's statements [sic].
>
> Now, I want you to be aware that the prosecutor's statement about the presence or not of a chain saw in the apartment and Mr. Amaro having to prove its presence to succeed,

- 6 -

is not part of the Court's duress instructions
and cannot be considered by the jury as an
instruction nor as what the law is. That is
not the law, and that was an incorrect
statement.

Now, the presence of a chain saw or not in the
apartment is an argument that the
prosecutor . . . has made and which you may
consider in your deliberations in determining
from the law and the evidence, as you find it,
whether Mr. Amaro was under duress or not.
However, if you consider that argument, you
must also equally consider Mr. Amaro's
arguments of duress which are not limited to
the presence or not presence of a chain saw.

Given the thoroughness and specificity of the curative instruction, we do not see how the prosecutor's statement caused prejudice that would warrant reversal. See United States v. Rodriguez, 675 F.3d 48, 63 (1st Cir. 2012) ("This court has repeatedly held that a strong, explicit and thorough curative instruction to disregard improper comments by the prosecutor is sufficient to cure any prejudice from prosecutorial misconduct," id. (quoting United States v. Riccio, 529 F.3d 40, 45 (1st Cir. 2008))), as "juries are presumed to follow such instructions," id. (quoting United States v. Gentles, 619 F.3d 75, 86 (1st Cir. 2010)). And that is so notwithstanding Amaro's contention on appeal that, because the instruction was not given until the morning after the prosecutor made the statement, it "increased the risk that the improper comment solidified in the minds of some jurors."

The problem for Amaro is that he objected to the District Court's giving a curative instruction immediately after the statement was made, on the ground that the jury was "tired" and thus that it would be "extreme[ly] prejudicial for the defense in this case to have them brought back in here to read a corrective instruction." He thus asked that a curative instruction be read "tomorrow morning." Because Amaro cannot "properly challenge on appeal a proposal [he himself] offered to the trial court," United States v. Angiulo, 897 F.2d 1169, 1216 (1st Cir. 1990), his challenge to this statement by the prosecutor fails.

**B.**

The other statement by the prosecutor that Amaro contends warrants reversal was made in the prosecutor's closing argument to illustrate the concept of reasonable doubt. The challenged statement began as follows:

> Now, you heard Judge Gelpi's instructions on reasonable doubt. Let me give you just an example of how you use reasonable doubt in your everyday lives. When your car is on empty, you go to the gas station. You pull up to the pump, you swipe your card, you pay for the gas, you open your tank -- . . .

At that point, defense counsel objected, but the District Court overruled the objection and instead warned the prosecutor that his analogy had to comply with the court's statement of the law. The prosecutor then continued in front of the jury as follows:

- 8 -

As I was explaining to you about reasonable doubt -- and let me remind you that your instruction on the law comes from the Judge. This is an example that I'm giving you to explain what reasonable doubt is and how it's something you use in your everyday lives.

So remember now, we're at the gas station. We've pulled up, we've swiped our card, we've opened our tank, we've put in our gas, we've filled up our car. It stops. It clicks. We take the pump out. We close our tank. We get into our car and our car drives. I submit to you, ladies and gentlemen, that all of this is circumstantial evidence that proves beyond a reasonable doubt that the substance you put in your car was gasoline. That is an example of how reasonable doubt is used in your everyday lives.

Amaro argues that when someone "pull[s] up to a gas station, [that person] ha[s] no reasonable doubts that the substance [she is] about to buy is gasoline," and that this presumption "persists unless and until [she] receive[s] some evidence that suggests that the substance was not gasoline." Amaro thus contends that the prosecutor's analogy "stood the presumption of innocence and the reasonable doubt standard on its head," by encouraging the jury to presume that Amaro was guilty and thereby "completely eviscerated the presumption of innocence and reasonable doubt."

But we have a hard time seeing how the prosecutor's statement improperly led the jury to believe that the beyond a reasonable doubt standard is less strict than it is. The prosecutor did not tell the jury that it could assume Amaro's guilt

in the same way that a driver can assume gas is sold at a gas station.  Rather, the prosecutor explained that the jury could convict only if it were as confident that Amaro was guilty after hearing the facts as a driver is confident he has purchased gas after entering a gas station, pumping gas, and driving away.

Moreover, we generally "assume[] that the jurors follow jury instructions and thus that they followed the judge's, not counsel's, definition of reasonable doubt."  United States v. Gonzalez-Gonzalez, 136 F.3d 6, 9 (1st Cir. 1998).  "That assumption is especially so here, since the prosecutor also told the jury to listen to the judge," id., and the prosecutor did so with respect to this very issue.  Given that the District Court properly instructed the jury on the presumption of innocence and the reasonable doubt standard and that the District Court also instructed the jury to follow the law as instructed by the court and not by counsel, the prosecutor's use of the gas station analogy did not so "poison[]the well" that we must reverse.  See Shoup, 476 F.3d at 43.

## III.

Amaro separately challenges his convictions on the ground that the District Court erred in delivering to the jury an "Allen charge," which is a supplemental instruction that a judge may give to a jury when it is deadlocked in its deliberations. The charge aims to "urg[e] the jury to return to its deliberations"

- 10 -

"for the sake of judicial economy."  United States v. Angiulo, 485 F.3d 37, 40 (1st Cir. 1973).  The charge takes its name from Allen v. United States, 164 U.S. 492 (1896), and it has been described as a "dynamite" charge because, due to its potentially coercive effect, it, "[l]ike dynamite . . . should be used with great caution."  United States v. Flannery, 451 F.2d 880, 883 (1st Cir. 1971).

Amaro's challenge takes two forms.  He first seeks reversal based on the District Court's decision to give the charge rather than to grant his request for a mistrial.  He also seeks reversal on the basis of the content of the charge that the District Court gave.  We start by describing the relevant facts.

**A.**

The jury began deliberating at 11 a.m. on the eighth day of trial.  After nine and half hours, the jury sent the District Court a note that read:

> After several hours of deliveration [sic], we could not reach an agreement and every juror strongly agree [sic] that nothing could be made to change his mind.

In response, the District Court proposed to the parties that he give an Allen charge.  The government agreed.  Defense counsel, however, asked the District Court to declare a mistrial instead.  The District Court denied the request for a mistrial.

- 11 -

The District Court then asked whether defense counsel had any objections to the court giving an <u>Allen</u> charge. Defense counsel stated that, given that his request for a mistrial had been denied, the charge should be given.

The District Court proceeded to instruct the jury with the First Circuit pattern <u>Allen</u> charge. Before doing so, however, the District Court made the following additional statement to the jury, which is not part of the First Circuit pattern <u>Allen</u> charge:

> Now, I am going to instruct you to go back to the jury room and resume your deliberations. Or, if you need to recess and come back tomorrow, do so; it's your decision. And I will explain why and give you some further instructions as to why this is necessary.
>
> Now, first of all, let me explain that this is a very important case. It's an important case for the United States and it's a very important case also for Mr. Amaro. The trial has been expensive -- and, again, not in money but expensive in time, effort, and emotional strain to all Counsel in this case -- they worked extremely hard. And what they're asking is that the respective clients, the United States and Mr. Amaro, have their day in court.
>
> The court also has put a lot of time and effort into this case, and I also know that you have put a lot of time and effort into this case. And I also remind you that it is your constitutional duty, as jurors, to try to reach a verdict following the instructions that I gave you and which I will repeat in part. Now, if you're unable to reach a verdict, the trial will remain open and another jury will have to be selected to try this case.

After receiving the charge, the jurors returned to their deliberations.  Approximately forty minutes later, the jury asked to review the video recording of the drug transaction.  The jury was given the recording.  At 12:15 a.m. the next day, after approximately three hours of post-Allen charge deliberations, the jury reached a verdict of guilty on all counts.

**B.**

A district court's decision not to declare a mistrial when confronted by a deadlocked jury is reviewed for abuse of discretion.  United States v. Peake, 804 F.3d 81, 98 (1st Cir. 2015), petition for cert. filed, 84 U.S.L.W. 3527 (Mar. 9, 2016) (No. 15-1134).  We see none here.

Amaro contends that the "deadlock should have been respected" because "[t]he jury had demonstrated fully through a long day and evening of deliberations that it had fully discharged its duty to consider the evidence and reach a conscientious decision."  But we have held that judges have acted within their discretion in denying motions for a mistrial after trials and deliberations of similar lengths to this one and in cases in which the indications that the jury was deadlocked were stronger.  See id. at 99 (holding that the district court did not abuse its discretion when it denied the defendant's request for a mistrial after a nine-day trial, two half-days of deliberations, and two notes from the jury stating that it could not reach a verdict);

- 13 -

see also United States v. Rengifo, 789 F.2d 975, 977-78, 985 (1st Cir. 1986) (holding that the trial court's denial of a mistrial and giving of an Allen instruction "was the correct response to the information that the jury was at an impasse" after seven hours of deliberations and two notes from the jury stating that it was deadlocked).  And so, as in those cases, we conclude the judge did not abuse his discretion in denying the motion for a mistrial in this case.[1]

### c.

Amaro's challenge to the content of the District Court's Allen charge is presented for the first time on appeal, and so he must show plain error.  United States v. Vanvliet, 542 F.3d 259, 266 (1st Cir. 2008).  Amaro must therefore show that "the Allen charge contained error which was obvious and affected his substantial rights, and that we should exercise our discretion to reverse such an error because it 'seriously affected the fairness, integrity or public reputation of judicial proceedings.'"  Id. (quoting United States v. Hernández-Albino, 177 F.3d 33, 37-38 (1st Cir. 1999) (internal quotation marks and brackets omitted)). And to establish that his substantive rights were affected by such

---

[1] Nor are we persuaded by Amaro's entirely speculative argument that the deadlock "could very well have been the result of the prosecutor's improper misstatement of the law regarding the duress defense" because "the jury asked for the duress instruction on two occasions after the judge gave the curative instruction."

- 14 -

error, Amaro must show that the Allen "'charge in its context and under all the circumstances' coerced the jury into convicting him." Hernández-Albino, 177 F.3d at 38 (quoting Lowenfield v. Phelps, 484 U.S. 231, 237 (1988)).

An Allen charge, by its nature, "can have a significant coercive effect by intimating that some jury members should capitulate to others' views, or by suggesting that the members should compromise their rational positions in order to reach an agreement." Id. And so, "[a]lthough federal courts have long sanctioned the use of supplemental charges in the face of an apparent impasse . . . , we have warned that such action should be undertaken with 'great caution.'" Id. (citation omitted) (quoting Flannery, 451 F.2d at 883).

In order to militate against the inherently coercive nature of an Allen charge, we have required that such a charge "contain three specific elements to moderate any prejudice." Id. Specifically, it must "(1) communicate the possibility of the majority and minority of the jury reexamining their personal verdicts; (2) restate the government's maintenance of the burden of proof; and (3) inform the jury that they may fail to agree unanimously." Peake, 804 F.3d at 98.

The Allen charge at issue here did all three of those things. Amaro nonetheless contends that the charge was improperly coercive because it failed to do something else: refer back to

- 15 -

Amaro's duress defense.  He contends that because the Allen charge "totally eliminated any mention of the affirmative defense[,] the juror[s] that might have been individually considering acquittal due to the defense lost legitimacy and were coerced by that charge."

But we have never held that a district court must instruct a jury on a defense in an Allen charge.  Thus, the District Court's decision to give a charge that communicated the three elements set forth in our prior case law was not clear or obvious error.  Cf. Vanvliet, 542 F.3d at 270 (failure to give Allen charge before the jury retired was not plain error because "[w]e have not even discussed the desirability of this practice in our own circuit precedents").

More promising for Amaro is his contention that the District Court included language in the charge that is not in the pattern instruction and that was likely to push jurors who were leaning toward acquittal to abandon that position and vote for conviction.  After all, we have previously advised trial courts to "avoid substantive departures from the formulations of the [Allen] charge that have already received judicial approval" and adding to those formulations "language which might heighten" the "coercive effect" of such charges.  Flannery, 451 F.2d at 883.  And the portions of the charge that Amaro challenges exemplify the problem with such ad libbing.

Amaro notes that, in going off-script, the District Court instructed the jurors that it was their "constitutional duty" to "try to reach a verdict." Amaro also points to the District Court's statement to the jury that the trial had been "expensive . . . not in money but expensive in time, effort, and emotional strain to all Counsel in this case -- they worked extremely hard," and that "[t]he court also has put a lot of time and effort into this case."[2] And he objects to the District Court's statement that if the jury failed to reach a verdict, "the trial will remain open and another jury will have to be selected to try the case," on the ground that the statement suggested that "it would be the jury's failure to reach a verdict that would be cause of putting a second jury through the process."[3] Finally, he

_____

[2] The government contends that this instruction "merely stated the obvious to a jury that had sat through an eight-day trial." That may be true, but the concern remains that, in combination with the other statements, the District Court's statement suggested the jurors should come to a decision because of the cost in "time, effort and emotional strain" to counsel and the court.

[3] The government argues that the language Amaro points to is "no more coercive" than instructions that this Circuit approved in United States v. Nichols, 820 F.2d 508 (1st Cir. 1987). But the instruction in Nichols -- that the jury should consider that it was "selected in the same manner and from the same source from which any future jury must be selected" and that there is no reason to believe that a future jury would be "more intelligent, more impartial or more competent" to decide the case -- simply encourages jurors to see themselves as capable of reaching a verdict. Id. at 511-12. By contrast, the instruction the District Court gave in this case suggested the jury would be burdening another group of twelve people -- and the District Court -- if it did not reach a verdict.

- 17 -

contends that this aspect of the charge was incorrect, as it was possible the government would decide not to try the case again and thus that a second jury would not be "put[] . . . through the process."

We are troubled by the aspects of the District Court's supplemental instructions that Amaro highlights. For while the District Court was free to tell the jury to "try to reach" a verdict, the supplemental instruction as a whole included much that seemed to pressure the jury to do more than simply try. In fact, we have criticized language similar to the language the District Court used in this case. See United States v. Paniagua-Ramos, 135 F.3d 193, 198 (1st Cir. 1998) (stating that "the aura of compulsion" in the trial court's Allen charge, which did not include all three necessary elements, "was intensified" by the court's statements that jury indecision "'is not going to be the end of this' and that 'in the long run' 'I will have to simply try this case again'"); Angiulo, 485 F.2d at 39 (disapproving of the trial court's statements to the jury about the expense of trial and that the court did not want to try the case again); Flannery, 451 F.2d at 883 (disapproving of the district court's statement that "the case must at some time be decided").

But even if the District Court's use of this supplemental language was clear or obvious error, Amaro still has not shown that the District Court's Allen charge "'in its context and under

- 18 -

all the circumstances' coerced the jury into convicting him," such that his substantial rights were affected. Hernández-Albino, 177 F.3d at 38 (quoting Lowenfield, 484 U.S. at 237). In reaching this conclusion, we acknowledge, as we have before, that there is no way to be sure of the impact on a jury of an Allen charge. See Angiulo, 485 F.2d at 40 ("The impact [of an Allen charge] can never be assessed accurately, for the relevant events take place in the secrecy of the jury room, and never appear in the trial record."). We nonetheless look to the factors that we have identified in the past as indicative of whether such a charge was coercive, and here those factors do not support a finding of prejudice.

After receiving the Allen charge, the jurors continued to deliberate for three hours, which is a period of time that we have characterized before as a "significant period of reflection" that counsels against finding a charge had a coercive effect. See Vanvliet, 542 F.3d at 270; see also Hernández-Albino, 177 F.3d at 39 (collecting cases in which post-charge deliberations of even one hour or less weighed against finding coercion). Moreover, the core factual dispute in the case was a relatively straightforward one -- whether Amaro was a willing or unwilling participant of the drug transaction -- and the three hours of post-charge deliberations constituted one-quarter of the total time the jury spent deliberating. These facts, too, point against a conclusion that the charge had a coercive impact. See Hernández-Albino, 177

- 19 -

F.3d at 39 (the fact that the jury deliberated for a total of "3 1/2 hours, of which the deliberations after the Allen charge represented one third," "negate[d] any suggestion of coercion" where "[t]he jury's task was [the] relatively straightforward" one of determining whether the defendant was "merely present" or actively involved in a drug conspiracy).

More significant still, less than an hour after receiving the Allen charge, the jury asked to review the videotape of the staged drug transaction and then continued deliberating for more than two hours. The jury's request to review this evidence further suggests that the jurors took seriously the District Court's instruction to "re-examine their positions" and "decide the case if [they could] conscientiously do so," and thus that the jurors did not reach their unanimous decision due to coercion imposed by the charge.

In sum, the language of the instruction is concerning and confirms the importance of district courts, in accord with our prior admonitions, hewing to the pattern instruction when giving an Allen charge. But this charge was not so clearly coercive on its face as to compel a finding of prejudice, even if we assume that some such charging language could. See Lowenfield, 484 U.S. at 239 (acknowledging that the language of one Allen charge may be more coercive than the language of another). And so, given the other indications from the record that bear on our assessment of

the harm that might have flowed from the problematic aspects of the charge, we conclude that Amaro has not met his burden of showing that the jury was coerced.  Amaro therefore has not shown that the District Court's Allen charge constituted plain error.

**IV.**

Amaro's final challenges to his convictions attack the sufficiency of the evidence presented against him.  "We review challenges to the sufficiency of the evidence de novo, 'considering all the evidence, direct and circumstantial, in the light most favorable to the prosecution, drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt.'"  United States v. Negrón-Sostre, 790 F.3d 295, 307 (1st Cir. 2015) (quoting United States v. Alejandro-Montañez, 778 F.3d 352, 357 (1st Cir. 2015)) (alteration omitted).

**A.**

Amaro argues that the trial evidence was insufficient to convict him of the count of conspiracy to possess with intent to distribute cocaine because "[t]here is no evidence that [he] joined the sham transaction conspiracy at any point prior to the entry into the apartment on May 28, 2010," or that he "had any involvement with any of the targets after May 28, 2010."  To the extent Amaro means to argue that the absence of such evidence

precluded a reasonable jury from finding that he knowingly and voluntarily participated in the conspiracy -- as the government was required to prove, see United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011) -- he is mistaken.

Amaro testified that he met with the two police officers who provided protection for the same drug transaction before traveling to the apartment where the drug transaction took place. And the jury reviewed a video recording of the drug transaction itself, in which Amaro is observed counting the sham cocaine, helping to frisk the drug courier, and keeping watch as the drug courier purchased the sham cocaine. From this evidence, a reasonable juror could have concluded beyond a reasonable doubt that Amaro entered the apartment having agreed to play the role of security guard during the drug transaction in exchange for payment. See United States v. Lara, 181 F.3d 183, 204 (1st Cir. 1999) ("Jurors are entitled to draw reasonable inferences from proven facts.").

## B.

Amaro next contends that, given the record evidence, no reasonable juror could have rejected his defense that he acted under duress and thus that no reasonable juror could have found him guilty beyond a reasonable doubt on any of the counts of which he was convicted. The parties appear to agree that, in reviewing this argument, the question is whether any reasonable juror could

have found by a preponderance of the evidence that Amaro did not act under duress.  But even assuming, favorably to Amaro, that the question is whether any reasonable juror could have found beyond a reasonable doubt that Amaro did not act under duress, see United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996); United States v. Amparo, 961 F.2d 288, 291 (1st Cir. 1992), we conclude that Amaro's challenge fails.

To find an absence of duress, a reasonable juror would have to find that Amaro did not "act[] under an immediate threat of serious bodily injury or death" with "a well grounded belief that the threat would be carried out[] and . . . no reasonable opportunity to escape or otherwise to frustrate the threat." Amparo, 961 F.2d at 291.  Amaro testified that he acted under an "immediate threat" when he aided the sham drug transaction.  He testified that he went to the apartment only in an effort to borrow $400 from one of the two police officers who also provided protection for the drug transaction.  And he testified that he stayed in the apartment only because he felt that his life would be in danger if he tried to leave.

But "[c]redibility determinations are uniquely within the jury's province, and we defer to the jury's verdict if the evidence can support varying inferences." United States v. García-Ortiz, 528 F.3d 74, 83 (1st Cir. 2008) (quoting United States v. Calderón, 77 F.3d 6, 10 (1st Cir. 1996)).  Here, the video evidence

- 23 -

could support, beyond a reasonable doubt, a finding that Amaro's testimony that he acted under duress was not credible.  See United States v. Rodriguez-Alvarado, 952 F.2d 586, 589 (1st Cir. 1991) (noting that "a state of mind" "can rarely be proven by direct evidence," and "is usually established by drawing reasonable inferences from the available facts" (quoting United States v. Bank of New England, 821 F.2d 844, 854 (1st Cir. 1987))).  In particular, the video recording of the staged drug transaction shows everyone, including Amaro, appearing relaxed throughout, with Amaro spending much of the time sitting on a couch, drinking a beer, and laughing.  Even the sham drug dealer's chain-saw comments to Amaro are mixed with laughter, as if they are jokes.

**V.**

Amaro also challenges his sentence, and he does so on two grounds.  Both of his challenges concern the jury's finding that his two drug offenses involved eleven kilograms of cocaine -- a finding that subjected him to a ten-year mandatory minimum in this case.  See 21 U.S.C. § 841(b)(1)(A).  Amaro argues that because of the problems he has identified, the case should be "remanded for resentencing without the applicability of the minimum mandatory sentence" of ten years.

**A.**

Amaro first argues that the District Court committed error under Alleyne v. United States, 133 S. Ct. 2151 (2013).

- 24 -

Specifically, Amaro argues that the District Court did not instruct the jury, and thus the jury did not find, that the amount of cocaine attributable to Amaro was an element of the offense that needed to be proven beyond a reasonable doubt.

As Amaro concedes that he did not raise this issue below, our review is for plain error.  See United States v. Harakaly, 734 F.3d 88, 94 (1st Cir. 2013).  Amaro must therefore show "that the error was clear or obvious, and that it both affected his substantial rights and 'seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Ramos-González, 775 F.3d 483, 499 (1st Cir. 2015) (quoting United States v. Ramos-Mejía, 721 F.3d 12, 14 (1st Cir. 2013)).  He has failed to do so.

Alleyne did not hold that a trial court must identify weight as an element of an offense in instructing the jury. Alleyne simply holds that, where weight increases the statutory minimum, it is an element and thus must be proven beyond a reasonable doubt.  See Alleyne, 133 S. Ct. at 2155.  As Amaro acknowledges, the District Court clearly did instruct the jury that it must find the drug quantity beyond a reasonable doubt.  So while the District Court did not specifically inform the jury that drug quantity was an element of the offense, the District Court did not plainly err in failing to do so.

Nor are we persuaded by Amaro's contention that our decision in United States v. Delgado-Marrero, 744 F.3d 167 (1st Cir. 2014), requires a different conclusion. In ruling that the instructions on drug quantity in Delgado were inadequate, we rejected the government's argument that because "the initial jury instructions unequivocally established the government's duty to prove each element of the underlying offense beyond a reasonable doubt," the jury had been properly instructed that drug quantity must be found beyond a reasonable doubt. Id. at 186. We explained that the government's argument "presume[d] that the jurors understood that . . . 'drug quantity' was an element of the underlying crime," but "[n]othing in the record support[ed] that presumption." Id. We thus held that "given the timing and manner in which the question was presented, the jurors understandably may have failed to appreciate that the additional question represented something more than an inconsequential afterthought." Id. at 187.

But here the jury was specifically instructed in advance of its deliberations that it needed to find the requisite drug quantity beyond a reasonable doubt. Thus, while in Delgado there was a "reasonable likelihood" that the jury understood the court's limited instructions to permit the application of something other than the reasonable doubt standard in assessing drug quantity, id. at 187-89; see United States v. Paz-Alvarez, 799 F.3d 12, 23-24

(1st Cir. 2015) (quoting <u>Victor</u> v. <u>Nebraska</u>, 511 U.S. 1, 6 (1994)), that is not so in this case.[4]

**B.**

Amaro next argues that, even if the jury was properly instructed on drug quantity, the evidence was insufficient to support a finding that the quantity of cocaine attributable to his offenses exceeded five kilograms. For that reason, he contends, he should be resentenced without the ten year mandatory minimum that applied because of that finding.

Amaro argues that there was "no evidence of the actual weight of the [sham] cocaine in this case." But the jury needed to find beyond a reasonable doubt only that Amaro believed that the amount of cocaine involved in the transaction exceeded five kilograms in order for Amaro to be subject to a ten-year mandatory minimum sentence. See <u>United States</u> v. <u>Sánchez-Berríos</u>, 424 F.3d 65, 78 (1st Cir. 2005) (holding that "[a] culpable conspiracy may exists even though the conspirators misapprehend certain facts"); <u>United States</u> v. <u>Medina-Garcia</u>, 918 F.2d 4, 7-8 (1st Cir. 1990) (holding that "factual impossibility" is not a "defense to a charge

_____

[4] Amaro also argues, albeit in passing, that the District Court erred because it instructed the jury only that it must find the amount of drugs involved in the drug transaction, rather than the amount of drugs attributable to Amaro. But the District Court instructed the jury to "make a finding as to the quantity of [cocaine] that Mr. Amaro either conspired or attempted to possess." And while the verdict form was not as precise as those instructions, Amaro does not challenge that form.

of attempt" because "[t]he criminal intention to commit the substantive crime . . . together with the fact that the crime was not consummated due to an external fact, are sufficient to charge [a] defendant with an attempt" (internal quotation marks omitted)). And the record provides clear support for such a finding.

The video recording of the sham drug transaction shows Amaro counting brick-shaped objects that had been designed to look like kilograms of cocaine. Amaro testified at trial that he thought each of the "bricks" was a kilogram of cocaine. The evidence further showed that there were eleven bricks, and that Amaro counted all eleven and announced that count to the group. The jury could thus conclude beyond a reasonable doubt that Amaro believed that the total weight of the cocaine involved in the transaction was eleven kilograms.

## VI.

Having found no error, we **affirm** Amaro's convictions and sentence.