# United States Court of Appeals
## For the First Circuit

No. 19-1465

UNITED STATES OF AMERICA,

Appellee,

v.

IVAN CRUZ-RIVERA,

Defendant, Appellant.

No. 19-1509

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS JIMENEZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson, Circuit Judge,
and Katzmann,* Judge.

---

     * Of the United States Court of International Trade, sitting
by designation.

Syrie D. Fried, with whom Good Schneider Cormier & Fried was on brief, for appellant Cruz-Rivera.

Jamesa J. Drake, with whom Drake Law LLC was on brief, for appellant Jimenez.

Andrew C. Noll, Criminal Division, Appellate Section, U.S. Department of Justice, with whom Robert A. Zink, Acting Deputy Assistant Attorney General, Michelle L. Dineen Jerrett and Donald C. Lockhart, Assistant United States Attorneys, Brian C. Rabbitt, Acting Assistant Attorney General, and Andrew E. Lelling, United States Attorney, were on brief, for appellee.

———————————

September 15, 2021

———————————

**KATZMANN, Judge.**  A jury convicted defendants Ivan Cruz-Rivera ("Cruz-Rivera") and Carlos Jimenez ("Jimenez") each of one count of conspiracy to possess with intent to distribute and to distribute one hundred grams or more of heroin, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1). Defendants now appeal, assigning error by the district court. Before us are claims that (1) evidence obtained during a traffic stop should have been suppressed, (2) the district court erroneously limited cross-examination of a witness for the government at trial, (3) the prosecutor unfairly misconstrued or misstated facts not in evidence during closing arguments, (4) the district court incorrectly instructed the jury in response to a question, and (5) the district court erred in applying the mandatory minimum sentence to Jimenez.  We affirm.

## I.   BACKGROUND

### A.   Facts

The facts are largely undisputed.  "We rehearse the facts as found by the district court (explicitly or implicitly) at the suppression hearing, consistent with record support."  United States v. Arnott, 758 F.3d 40, 41 (1st Cir. 2014) (citing United States v. Gonzalez, 609 F.3d 13, 15 (1st Cir. 2010)).  On October 4, 2013, the DEA's Central Massachusetts Federal Drug Task Force set up a surveillance of a controlled purchase by a confidential

- 3 -

source at 105-107 Union Street in Leominster, Massachusetts, a property with several individual garage bays, as part of an investigation into heroin distribution in the Worcester, Massachusetts area. Equipped with audiovisual recording equipment, body- and dash-cams, officers witnessed Jimenez, accompanied by Cruz-Rivera, drive to the Union Street garages in a gray Lexus. There, according to the government, they visited Segundo Gutierrez, a known heroin dealer in Central Massachusetts, who rented a garage bay at Union Street. Cruz-Rivera and Gutierrez exchanged messages and phone calls on October 4, and in the days prior.

Earlier on October 4, a confidential source working with the Task Force visited Gutierrez's garage bay seeking to purchase heroin. Gutierrez told the source that he did not have heroin but would a short time later. The confidential source left the garage. Task Force agents then witnessed Gutierrez wave a gray Lexus with a New Jersey license plate into the Union Street garages. The men spent nearly two hours at the garage, and left shortly after 2:00 p.m. During this time, several other cars came and went from the Union Street garages. Upon exiting the Union Street garages, Gutierrez directed the gray Lexus towards the highway. The confidential source then returned to the garage, where Gutierrez sold him over 125 grams of heroin in exchange for $7,500.

An officer on the surveillance team, Massachusetts State

Trooper Jake Vitale, followed the Lexus after it left the Union Street garages in the officer's unmarked vehicle. Vitale communicated with the lead officer of the DEA investigation and received instructions to stop the Lexus via a "walled-off" stop, a stop not based on any information connected to the visit at the Union Street garages. Trooper Vitale followed the Lexus for an hour until it approached Route 84, and then, via the Massachusetts State Police, informed State Trooper David DiCrescenzo of his pursuit and investigation at the Union Street garages. Trooper Vitale instructed Trooper DiCrescenzo to stop the vehicle in order to identify the occupants, but to do so based on his own development of probable cause. Trooper DiCrescenzo was trained to conduct motor vehicle stops and criminal investigations and to detect indicators of criminal activity, and had conducted a number of narcotics investigations. After waiting in the median of Route 84 -- a road which Trooper DiCrescenzo testified was a known drug-trafficking thoroughfare, -- he spotted and followed the Lexus until, at about 3:15 p.m., he observed the Lexus change lanes without using a turn signal within two to three lengths of a vehicle in the middle lane. Trooper DiCrescenzo then stopped the Lexus and identified the driver as Jimenez with Cruz-Rivera as passenger. Trooper DiCrescenzo then questioned defendants, during which time he witnessed defendants acting "extremely nervous" and "physically shaking." After running the license plate of the

Lexus and driver's license numbers for defendants in state databases, Trooper DiCrescenzo asked Jimenez to step out of the vehicle for further questioning by a guardrail, which lasted a couple of minutes. The vehicle was coming from a known drug distribution area. Jimenez provided inconsistent testimony about his whereabouts that day and explained that he and Cruz-Rivera had cash in the car for the purpose of purchasing a truck. After he finished questioning Jimenez, Trooper DiCrescenzo placed Jimenez in the back of his patrol car, informing him that it was for his safety (as well as for Trooper DiCrescenzo's safety) and that he was not under arrest. Trooper DiCrescenzo then asked Cruz-Rivera to step out of the car for further questioning, part of which was done via translation by another, Spanish-speaking officer over the phone. Cruz-Rivera indicated that there was $1,000 in the car, and pointed Trooper DiCrescenzo to a black bag on the back seat, in which Trooper DiCrescenzo then witnessed bundles of cash secured with elastic bands. Jimenez then consented to a search of the vehicle. Upon searching the Lexus, officers discovered $44,000 in bundles of cash and three cell phones. Other officers arrived at the scene to assist with the search, including a K-9 unit. The officers seized the black bag containing the cash and one cell phone, and two additional cell phones found under the front passenger seat. Cruz-Rivera and Jimenez were then permitted to leave in the Lexus. Gutierrez and Jimenez exchanged several phone

calls that afternoon and evening.  The next day, Cruz-Rivera and Jimenez went to retrieve a receipt for the $44,000 in cash seized during the stop.

### B. Proceedings

In June 2016, Cruz-Rivera and Jimenez were charged by a grand jury each of one count of conspiracy to possess with intent to distribute and to distribute heroin, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1). Prior to trial, Cruz-Rivera and Jimenez each moved to suppress evidence seized and statements made to law enforcement officers during the October 4, 2013, traffic stop.  The district court denied the motions to suppress.  The case proceeded to trial where the jury heard testimony from several witnessing officers and Gutierrez, and reviewed body- and dash-cam footage and cell phone records.  Cruz-Rivera also testified in his defense, claiming that the money seized by police was his own and that his visit to Gutierrez was for the purposes of finding a truck that he could purchase.  The parties then presented closing arguments and the jury deliberated, after which it found both Cruz-Rivera and Jimenez guilty of conspiracy involving one hundred grams or more of heroin (count 1) and possession with intent to distribute heroin (count 2).  The district court sentenced Cruz-Rivera to seventy-six months of imprisonment, followed by supervised release, and

Jimenez to sixty months of imprisonment, followed by supervised release.

## II.  DISCUSSION

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).  We review the district court's findings of fact for clear error and accept all reasonable inferences that it has drawn. See United States v. Coombs, 857 F.3d 439, 445-46 (1st Cir. 2017) (citing United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994); then citing United States v. Paneto, 661 F.3d 709, 711 (1st Cir. 2011)).  We recount the facts here "in the light most favorable to the suppression ruling" as one of the challenges addressed in this opinion is to the admissibility of certain key evidence. Arnott, 758 F.3d at 43 (first citing United States v. McGregor, 650 F.3d 813, 823-24 (1st Cir. 2011); and then citing United States v. Owens, 167 F.3d 739, 743 (1st Cir. 1999)).  We review the district court's legal conclusions de novo.  Id.

### A.  Suppression Ruling

First, defendants challenge the district court's pre-trial rulings denying their motions to suppress evidence. Specifically, they challenge the admission of evidence collected as a result of the search of the car -- the bundled cash and cell phones -- and challenge the admission of their statements during the traffic stop into evidence.  When reviewing a suppression ruling, the district court's findings of fact are reviewed for

- 8 -

clear error and "the court's legal conclusions, including its answers to 'the ultimate questions of reasonable suspicion and probable cause to make a warrantless search'" are reviewed de novo. Id. (quoting Ornelas v. United States, 517 U.S. 690, 691 (1996)). Similarly, when reviewing whether a defendant was in custody for Miranda purposes, factual questions are reviewed for clear error and the ultimate legal question de novo. United States v. Campbell, 741 F.3d 251, 265 (1st Cir. 2013) (citing United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011)). Furthermore, we review "the record evidence in the light most favorable to the suppression ruling," and we can affirm "on any basis apparent in the record." Arnott, 758 F.3d at 43. "Given the textured nature of these inquiries, appellate courts must proceed circumspectly and with regard for the district court's superior vantage point." United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007) (citing Zapata, 18 F.3d at 975 (instructing that, when reviewing the outcome of a motion to suppress, appellate courts must "exhibit great respect for the presider's opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first hand")).

### 1. Evidence Seized During the Traffic Stop
#### a. The district court ruling.

The district court, relying on Whren v. United States, 517 U.S. 806 (1996), concluded that the traffic stop was lawful in

nature because Trooper DiCrescenzo observed two traffic violations prior to stopping the Lexus. The district court found that "the collective knowledge doctrine provided sufficient reason to stop the motor vehicle and to search it."[1] The court determined that the DEA Task Force Officers surveilling the Union Street garages possessed "ample probable cause" to believe that defendants were engaged in criminal activity, that the car contained related drugs and money, that this knowledge was imputed to Trooper DiCrescenzo under the collective knowledge doctrine, which allowed the evidence produced by the eventual stop to be seized and admitted at trial.

---

[1] The court found that

> [a]t the time that the Lexus was stopped, the DEA had been involved in investigation spanning over seventeen months during which six controlled purchases of heroin had taken place from an individual whom the task force believed was being supplied by Gutierrez, from the Union Street address. The CS [confidential source] went to that address and attempted to purchase 125 grams of heroin. Gutierrez told the CS that he was expecting a delivery by 1:30 p.m. The Task Force observed him on his cellphone giving directions, and shortly thereafter surveillance saw the Lexus enter the garages and leave 2 hours later. When the CS returned to the garage shortly after the Lexus left, he bought heroin and was told by Gutierrez that the marks on his face were from the mask that he was wearing while he processed the heroin. These facts provide ample probable cause for the stop and search.

### b. Basic principles.

The automobile exception to the Fourth Amendment's warrant requirement permits officers to "seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband." United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (first citing Robinson v. Cook, 706 F.3d 25, 31-32 (1st Cir. 2013); and then citing Florida v. White, 526 U.S. 559, 563-64 (1999)). Police have probable cause to search "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas, 517 U.S. at 696; United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017). "Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found.'" Silva, 742 F.3d at 7 (quoting Robinson, 706 F.3d at 32). Search of a motor vehicle requires "particular facts indicating that, at the time of search, the vehicle or a container within it carried contraband, evidence of crime, or other seizable matter." United States v. Infante-Ruiz, 13 F.3d 498, 502 (1st Cir. 1994).

A temporary detention of an individual during a traffic stop by police constitutes a seizure to which the protections of the Fourth Amendment apply. Delaware v. Prouse, 440 U.S. 648, 653

- 11 -

(1979) (first citing United States v. Martinez-Fuerte, 428 U.S. 543, 556-58 (1976); then citing United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975); and then citing Terry v. Ohio, 392 U.S. 1, 16 (1968)). A warrantless traffic stop must "not be 'unreasonable' under the circumstances." Whren, 517 U.S. at 810. "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. (citing Prouse, 440 U.S. at 659). A traffic stop is a "relatively brief encounter" intended to "address the traffic violation that warranted the stop" and may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 575 U.S. 348, 354-55 (2015) (first quoting Knowles v. Iowa, 525 U.S. 113, 117 (1998); then citing Illinois v. Caballes, 543 U.S. 405, 407 (2005); then citing Prouse, 440 U.S. at 658-60). However, such a stop can be extended where there is reasonable suspicion of further criminal wrongdoing. United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003) (citing United States v. Velez-Saldana, 252 F.3d 49, 53 (1st Cir. 2001); United States v. Martinez-Molina, 64 F.3d 719, 727-30 (1st Cir. 1995)). "No simple, mechanical formula tells us what reasonable suspicion is, though we know that it is less than probable cause and more than a naked hunch . . . . [C]ourts must gauge its presence in a commonsense, case-by-case

way, taking in the whole picture." McGregor, 650 F.3d at 821. We have said that the reasonableness "determination . . . entails a measurable degree of deference to the perceptions of experienced law enforcement officers." United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008) (citing Ornelas, 517 U.S. at 699; United States v. Chhien, 266 F.3d 1, 8 (1st Cir. 2001)). Reasonable suspicion is based on the totality of the circumstances. Florida v. Harris, 568 U.S. 237, 244 (2013); Infante-Ruiz, 13 F.3d at 502.

Reasonable suspicion or probable cause may be based on the collective knowledge of several officers. United States v. Hensley, 469 U.S. 221, 231–32 (1985); United States v. Barnes, 506 F.3d 58, 62-63 (1st Cir. 2007). In such cases, we "look to the collective information known to the law enforcement officers participating in the investigation rather than isolat[ing] the information known by the individual arresting officer." Azor, 881 F.3d at 8 (citing Illinois v. Andrea, 463 U.S. 765, 772 n.5 (1983); United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002)); Barnes, 506 F.3d at 62.

### c. Analysis.

Both Cruz-Rivera and Jimenez argue that the district court's conclusion that probable cause supported the traffic stop, search, and detention of defendants was erroneous, viewed either through Trooper DiCrescenzo's own reasonable suspicion during the traffic stop or when considered in conjunction with the collective

- 13 -

knowledge imparted to Trooper DiCrescenzo. Thus, they each contend that the physical evidence collected and statements made during the stop should have been suppressed. The government counters that the district court did not err and that in any event there was an alternative ground to sustain the denial of the motion to suppress -- namely, that the reasonable suspicion that supported the traffic stop evolved and ripened into probable cause to search the vehicle as Trooper DiCrescenzo evaluated defendants' actions and responses during the stop. We agree with the outcome reached by the district court, but for reasons different from those articulated in the suppression decision. Given that we can sustain a ruling based on alternate grounds not articulated by the trial court, so long as there is persuasive support for that analysis in the record, we will do so here, particularly where that route is more direct to the "same destination." Arnott, 758 F.3d at 43.

First, defendants' argument that it is important to consider the differences between the "walled-off" stop here and a traffic stop that begins without an "investigatory motive," is unavailing. Under our case law, as defendants acknowledge, "[a]n officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." McGregor, 650 F.3d at 820 (citing Whren, 517 U.S. at 810); see also id. at 822 ("[C]ourts do not 'plumb[ ]' an officer's 'actual

- 14 -

motive' in performing a reasonable-suspicion analysis." (second alteration in original) (quoting Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004))); Ruidíaz, 529 F.3d at 29 (reasonableness in the traffic-stop context is "not dependent on an individual officer's subjective motives"). Defendants acknowledge that Trooper DiCrescenzo had a sufficient basis to initiate the traffic stop based on the traffic violation.

Regardless of the collective knowledge of all officers involved, Trooper DiCrescenzo alone had reasonable suspicion of a drug offense from the outset of the traffic stop because Trooper Vitale specifically told him that the vehicle came from Leominster and likely had been involved in a drug transaction. Trooper DiCrescenzo's knowledge of this information was relevant to his assessment of the traffic stop and his investigation therefrom. His training and experience in narcotics investigations and in detecting indicators of criminal activity informed his judgments, and, as noted, we give weight to them accordingly. See Ruidíaz, 529 F.3d at 29. While every case turns on its own facts, we are informed by our decisions which have identified factual elements similar to those present here in affirming reasonable suspicion determinations. As has been noted, Trooper DiCrescenzo knew that defendants were travelling on a known drug-trafficking thoroughfare and were coming from a drug distribution area. Upon approaching the vehicle, Trooper DiCrescenzo witnessed both

defendants acting visibly nervous, and Jimenez's hands "physically shaking." Defendants were more nervous than ordinary motorists, and that nervousness persisted throughout the stop. See United States v. Dion, 859 F.3d 114, 126-27 (1st Cir. 2017) (pointing to a defendant's persistent nervousness, odd travel route and stated purpose of travel along a drug-trafficking corridor to support reasonable suspicion determination, and collecting cases doing the same); Arnott, 758 F.3d at 44-45 (affirming determination that reasonable suspicion arose when a suspected drug dealer was monitored for a few weeks, an officer was told to undertake a traffic stop after an apparent drug purchase, and the driver appeared "unduly nervous" and his "hands were shaking"). Furthermore, Trooper DiCrescenzo's run of Jimenez's driver's license and license plate showed that the license had also been run by the Worcester Police Department, consistent with Trooper Vitale's information about the vehicle's earlier whereabouts and contrary to Jimenez's statement at the beginning of the traffic stop that defendants had been visiting family in Lawrence. Upon questioning Jimenez outside the Lexus, Trooper DiCrescenzo learned that Jimenez, providing inconsistent answers, first could not name the members of his family that he claimed to have visited and then claimed that he and Cruz-Rivera were in Massachusetts to buy a truck for which there was cash in the car. See United States v. Clark, 879 F.3d 1, 5 (1st Cir. 2018) (affirming reasonable

suspicion where defendant provided dates of birth that were "inconsistent with" initial date provided to officer); United States v. Molina-Gómez, 781 F.3d 13, 20 (1st Cir. 2015) (affirming reasonable suspicion where defendant "could not remember the last name" of a "friend he was visiting"); United States v. Lamela, 942 F.2d 100, 102 (1st Cir. 1991) (affirming reasonable suspicion where defendant provided "inconsistent responses to routine questions relating to the purpose of his travel"). Trooper DiCrescenzo observed that the purported travel plans "were inconsistent with the normal family trip" -- "a very long trip, about 200 miles to visit with a relative for two hours in Lawrence . . . [,] a known drug distribution area," only "to turn around and drive 200 miles back . . . seems strange." See United States v. Ramdihall, 859 F.3d 80, 92 (1st Cir. 2017) (relying in part on odd explanation of travel plans to support reasonable suspicion); Dion, 859 F.3d at 126-27 (same). Taken in isolation, any one of these facts would not necessarily support reasonable suspicion, see, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000), but our task is not to perform a "divide-and-conquer analysis," which would be counter to our charge to look to the totality of the circumstances, United States v. Arvizu, 534 U.S. 266, 274 (2002). See also Ruidíaz, 529 F.3d at 30 (observing that "a fact that is innocuous in itself may in combination with other innocuous facts take on added significance"). Thus, at this point in the stop, there was a

sufficient basis for Trooper DiCrescenzo to have reasonable suspicion of wrongdoing that supported his continued detention and questioning of defendants.

Next, Trooper DiCrescenzo's further investigations ripened his reasonable suspicion into probable cause. See Martinez-Molina, 64 F.3d at 726 ("[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts.") (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). Trooper DiCrescenzo's reasonable suspicion prompted him to pursue questioning that would allow him "to investigate potential narcotics trafficking." In questioning Cruz-Rivera, Trooper DiCrescenzo again heard that defendants had travelled only to Lawrence and was shown the black bag in the car; however, that bag revealed not the $1,000 that Cruz-Rivera stated was present in the vehicle, but "obviously tens of thousands of dollars" in bundles secured with elastic bands that based on his training and experience Trooper DiCrescenzo associated with narcotics trafficking. Taking a reasonable and lawful measure to protect himself from possible harm, Trooper DiCrescenzo moved Cruz-Rivera to the side when he obscured his view into the bag. See United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998) (officers "must be permitted to take measures . . . they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others"). Indeed, looking at the totality of the

circumstances -- as we must -- a reasonable view of the record evidence supports the conclusion that, at this point, Trooper DiCrescenzo's reasonable suspicion that defendants were involved in drug trafficking had ripened into probable cause, such that the resulting search of the vehicle -- which Trooper DiCrescenzo believed would yield evidence of criminal wrongdoing -- was permissible. See Lee, 317 F.3d at 33; id. at 32 ("Probable cause often accretes gradually as an investigation progresses . . . . [T]he circumstances giving rise to reasonable suspicion . . . and the developments that unfolded during the Terry stop furnished probable cause for the appellant's arrest."); Dion, 859 F.3d at 133 (collecting cases where probable cause provided by various facts including conflicting or inconsistent stories about travel plans, and nervousness); United States v. Maldonado, 356 F.3d 130, 137 (1st Cir. 2004) (implausible explanations and incredible travel tale supported probable cause).

Defendants' attempts to explain away Trooper DiCrescenzo's basis for his reasonable suspicion and later probable cause are unsuccessful. First, as we have noted, reasonable suspicion is considered based on the totality of the circumstances presented to a law enforcement officer, Harris, 568 U.S. at 244, with measurable deference given to the officer's view of the situation, Ruidíaz, 529 F.3d at 29. This includes his knowledge of the vehicle based on statements made directly to him

by another officer and his own observations of defendants' behavior. Defendants' efforts to parse actions and statements in isolation are unavailing. See Terry, 392 U.S. at 22 (explaining that each act may be "perhaps innocent in itself," but taken together, the acts "warranted further investigation"); see also District of Columbia v. Wesby, 138 S. Ct. 577, 588 (2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."). We find unpersuasive defendants' reliance on Rodriguez v. United States, where the Court stated that if a seizure is "justified only by a police-observed traffic violation," officers may not prolong a stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." 575 U.S. at 350, 355 (emphasis added). Contrary to defendants' claims, and taking the facts in the light most favorable to the suppression ruling, the traffic stop here was not unreasonable because, far more than suspicion of just a traffic infraction, Trooper DiCrescenzo had sufficient reasonable suspicion of criminal activity to prolong the stop based on Trooper Vitale's statement that the vehicle had been involved in a drug transaction and subsequent investigation.

In short, we affirm the district court's decision not to suppress evidence that resulted from the search of the vehicle because we conclude that the officer had the requisite reasonable suspicion to initiate the stop and that reasonable suspicion

ripened into probable cause based on additional investigation. We find no reason to reach the applicability of the collective knowledge doctrine.

### 2. Statements Made During the Traffic Stop

Defendants also argue that, because the stop exceeded a routine traffic stop, the questioning by Trooper DiCrescenzo was a custodial interrogation requiring <u>Miranda</u> warnings. They contend that their statements (including Jimenez's consent to the search of the vehicle and subsequently obtained evidence) made during the traffic stop should have been suppressed because Trooper DiCrescenzo did not administer <u>Miranda</u> warnings to either defendant.

Noting that "defendants argue that Trooper DiCrescenzo's roadside conduct was a de facto arrest thus requiring the trooper to provide them with <u>Miranda</u> warnings[,]" the district court did not make an explicit ruling on whether those warnings were required. Observing that a <u>Terry</u> stop can "morph into 'custody' for <u>Miranda</u> purposes," and setting forth the factors that a court must consider to determine whether there was "restraint on freedom of movement associated with the formal arrest," the court stated that "regardless of what the defendants said or did during the stop, Trooper DiCrescenzo was going to search the motor vehicle. His plan has no bearing on the question of whether the defendants were in custody." In the district court's view, there was

sufficient probable cause to make an arrest and search of the car and, "[b]ecause there was, at a minimum, articulable and reasonable suspicion that the defendants were engaged in criminal activity, the authorities were entitled to stop the vehicle, detain the occupants, and pursue a means of investigation that was likely to confirm or dispel their suspicion." Hence, the district court ruled defendants' statements made during that stop should not be suppressed but were admissible at trial.

We conclude that Miranda warnings were not required. Incriminating statements obtained during a custodial interrogation, where "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," must be excluded from criminal prosecutions unless a defendant has waived the Fifth Amendment privilege after being warned of the right to remain silent. Miranda v. Arizona, 384 U.S. 436, 444 (1966). The custodial inquiry is an "objective, suspect-focused" examination that is "informed by our assessment of the reasonableness of the detaining officer['s] . . . actions in response to developing conditions." United States v. Chaney, 647 F.3d 401, 409 (1st Cir. 2011). A finding of custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." United States v. Melo, 954 F.3d 334, 340 (1st Cir. 2020) (quoting Stansbury v. California, 511

U.S. 318, 323 (1994) (per curiam)). And "[w]here an investigatory stop is justified at its inception [(and we have just observed this one was indeed justified)], it will generally not morph into a de facto arrest as long as 'the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop.'" Chaney, 647 F.3d at 409 (quoting United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001)).

In Berkemer v. McCarty, 468 U.S. 420, 440 (1984), the Supreme Court ruled that Miranda warnings are not required in "ordinary" traffic stops. However, as we have had occasion to observe, "[n]otably, despite its holding that, generally, law enforcement officers are not required to give Miranda warnings at traffic stops, the [Berkemer] Court established no categorical rule. Indeed, it held that Miranda warnings would be required 'as soon as a suspect's freedom of action is curtailed to 'a degree associated with formal arrest.'" Campbell, 741 F.3d at 266 (emphasis in original) (first quoting Berkemer, 468 U.S. at 440, and then quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). Our task here is, as was set forth in Campbell, "to determine whether the facts of a specific case indicate a situation more akin to a routine traffic stop, at which Miranda warnings are not required," or indicate that detention has

escalated such that "a suspect has been 'subjected to restraints comparable to those associated with a formal arrest,' at which point Miranda warnings are required." Id. (quoting Berkemer, 468 U.S. at 441).

The need for a Miranda warning turns on whether defendants here were in custody, but that determination is a two-step process. See, e.g., Melo, 954 F.3d at 339 (observing that the "inquiry into 'whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last,'" and "[o]nce we complete the freedom-of-movement step, we must still ask 'the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.'" (quoting Howes v. Fields, 565 U.S. 499, 509 (2012))).

For the first step, to "ascertain whether . . . a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave[,]'" Howes, 565 U.S. at 509 (alteration in original) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)), we look to a number of factors "relevant to this aspect of our custody analysis," Melo, 954 F.3d at 340. These include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the

interrogation." Id. (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)). In "evaluating all of the circumstances surrounding the incident . . . . [,] no single element dictates the outcome of this analysis." United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) (quoting the Masse factors in an analysis of traffic stop and custody).

We turn to the application of the custodial factors. As to the first factor in our freedom of movement analysis -- whether the questioning took place in familiar or at least neutral surroundings -- we note that here it was Route 84. On this record, it seems clear that these surroundings were not familiar to the out-of-state defendants. Our case law often describes highways and roadsides as neutral. See, e.g., Jones, 187 F.3d at 218 ("Although the location apparently was not familiar to [the defendant] and the area was not well-lit, a public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse."); Berkemer, 468 U.S. at 421 ("[T]he typical traffic stop is conducted in public, and the atmosphere surrounding it is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda and subsequent cases in which Miranda has been applied."). However, that a highway is not per se police-dominated in the same way that the interrogation room in a station house is does not mean that it is per se neutral.

Where, as here, the police are controlling the situation the neutrality of the site is arguably brought into question.

With respect to the second factor -- the number of officers -- under our case law, the presence here was not excessive. For the relevant time frame, defendants were questioned by one officer, Trooper DiCrescenzo, although briefly aided by another translating officer via telephone. See, e.g., Campbell, 741 F.3d at 267 (finding four or five police officers questioning three defendants not to be a custodial interrogation); United States v. Crooker, 688 F.3d 1, 12 (1st Cir. 2012) (determining a suspect was not in custody when "no more than two agents were in direct conversation" with the suspect at one time).

Regarding the third factor, the degree of physical restraint placed on the suspects, we note that after Trooper DiCrescenzo had finished questioning Jimenez, he placed Jimenez in the back seat of his cruiser, informing him that he was not under arrest but was being placed in the vehicle for his safety (and also for the trooper's). The result was that Jimenez was physically locked in the back of the trooper's cruiser and unable to let himself out, and Cruz-Rivera, deprived of his driver, was thereby impacted. While Jimenez was in the back of the cruiser, Trooper DiCrescenzo questioned Cruz-Rivera and continued his investigation. Notably, because Jimenez's statements were made prior to being placed in the patrol car, his physical restraint is

arguably inconsequential. In any event, the cases analyzing physical restraint in motor vehicle stop cases are, of course, fact dependent. See, e.g., United States v. McCarthy, 77 F.3d 522, 532 (1st Cir. 1996) (although detention issue was "exceptionally close," stop was not "needlessly intrusive" where defendant, who was placed in back of the officer's vehicle, was never handcuffed, there was no evidence that the officer ever drew a gun, and where officers informed defendant that "although he was not free to leave, he was not under arrest, and they were detaining him for investigative purposes because a car identical to his . . . had been involved in a bank robbery earlier that day"); United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009) ("the fact that [defendant] 'was placed in the back of a police cruiser does not elevate the detention beyond a Terry stop'") (quoting Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004)); Ruidíaz, 529 F.3d at 32 ("When a Terry stop is effected in connection with a traffic violation and an officer's concern for his own safety is implicated, it is within the officer's authority to order a passenger out of the car as a security measure"; "an officer may issue such an order as a matter of course; he does not need to have an independent fear for his safety.") (citations omitted).

As for the final factor -- the duration and character of interrogation -- the duration was not excessive under our case law. See, e.g., United States v. Hughes, 640 F.3d 428, 437 (1st

- 27 -

Cir. 2011) (characterizing a ninety-minute interview as "relatively short")). The questioning was complete just over a half-hour after the initiation of the stop (regardless of the longer duration of the stop in its entirety). Further, Trooper DiCrescenzo's questioning lasted only a few minutes for each defendant. There is no testimony suggesting the trooper was hostile or made shows of force during the stop). In sum, "[t]here is no indication that the stop lasted for an inappropriately long period of time or that the officers acted with hostility toward the defendants." Campbell, 741 F.3d at 267.

Although we have just surveyed the various custodial factors, we need not tote up how defendants fare as to them. In this case, we need not resolve the first step question of whether defendants' freedom-of-movement was curtailed, because even assuming arguendo that it was, we conclude that defendants do not prevail with respect to the requisite second step of the custody analysis. "[A] suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda." United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010). As we have noted, "whether an individual's freedom of movement was curtailed" is just "the first step in the analysis, not the last." Melo, 954 F.3d at 339 (quoting Howes, 565 U.S. at 509)). We still need to turn to "the additional question whether the relevant environment presents the same

inherently coercive pressures as the type of station house questioning at issue in Miranda." Id. (quoting Howes, 565 U.S. at 509); see also Maryland v. Shatzer, 559 U.S. 98, 113 (2010) ("[T]he freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody."). The focus here is whether a person would reasonably find the circumstances coercive enough that the concern that drove Miranda comes into play, Ellison, 632 F.3d at 729, i.e., whether there is enough pressure on a person to sufficiently impair his free exercise of his privilege against self-incrimination. This inquiry is the crux of our analysis because Miranda "does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." Minnesota v. Murphy, 465 U.S. 420, 430 (1984) (quoting Roberts v. United States, 445 U.S. 552, 560 (1980)); see also Campbell, 741 F.3d at 265. After all, "'[c]ustody' for purposes of Miranda must be 'narrowly circumscribed' to effectuate the precise purpose of the warnings." Campbell, 741 F.3d at 265 (quoting Murphy, 465 U.S. at 430).

Bearing all of this in mind, the stop here, "given the facts as found by the district court, 'lacked the coercive element necessary to convert it into something more draconian,' based on the totality of the circumstances." United States v. Fornia-Castillo, 408 F.3d 52, 65 (1st Cir. 2005) (quoting Lee, 317 F.3d at 32). In this regard, we are informed by comparing the

circumstances before us with the many other cases where we have deemed more restrictive settings noncustodial. See, e.g., Jones, 700 F.3d at 625 (1st Cir. 2012) ("[P]olice officers may use multiple vehicles, multiple officers, handcuffs and drawn weapons without turning a Terry stop into a de facto arrest."); Fornia-Castillo, 408 F.3d at 64-65 (concluding that a suspect was not in custody when a single officer stopped the suspect on a busy public road, drew his gun in a defensive position, handcuffed the suspect for ten to fifteen minutes, frisked the suspect, and questioned the suspect while he was handcuffed); United States v. Maguire, 359 F.3d 71, 79 (1st Cir. 2004) (finding, on balance, no de facto arrest because even though police had wrestled suspect to the ground and an officer drew his weapon, the suspect hadn't been "detained in a manner consistent with a formal arrest," the events took place on a public street during "the light of day," (quoting Trueber, 238 F.3d at 94) and no handcuffs were used); Lee, 317 F.3d at 31-32 (reasoning that even when officers drew their guns and blocked the suspect's vehicle from leaving the scene, the investigative stop did not amount to a de facto arrest). True, a reasonable person in either Cruz-Rivera or Jimenez's position would not have thought himself free to walk away -- it is reasonable that they would have understood "something more than a routine traffic stop was in progress" -- "[b]ut on the broad spectrum from a speeding ticket to a grilling in the squad room,

- 30 -

the events here were . . . short of any <u>de facto</u> arrest or custodial interrogation," and, "given this, and that the circumstances were not inherently coercive, no <u>Miranda</u> warning was required." <u>United States</u> v. <u>Teemer</u>, 394 F.3d 59, 66 (1st Cir. 2005). In sum, while the situation certainly had some arrest-like aspects to it, a reasonable person in either defendant's position would not have believed he was under arrest. Therefore, the district court properly denied defendants' motion to suppress their statements made during the stop.[2]

## B. Cross-Examination

Next, Cruz-Rivera argues that the district court impermissibly limited questioning of Gutierrez in violation of the Confrontation Clause by not allowing full cross-examination on Gutierrez's discussions with the government regarding his plea deal and sentencing for two other federal drug offenses. During Gutierrez's cross-examination by Cruz-Rivera, the district court sustained objections by the government to limit questioning about Gutierrez's plea deal and cooperation agreements for two other drug offenses, so as to avoid him possibly recounting what his

---

[2] Cruz-Rivera's reliance on <u>United States</u> v. <u>Chhien</u>, <u>supra</u>, is unpersuasive. While <u>Chhien</u> warned against the danger of a routine traffic stop being used as an excuse to interrogate an individual about unrelated suspected criminal offenses, this case falls squarely within Chhien's conclusion that an officer may conduct "[r]outine questioning . . . even when not directly related to the violations that induced the stop in the first place," such as about the driver's itinerary. 266 F.3d at 9.

lawyers told him and thereby misleading the jury. Later, when Cruz-Rivera returned to questioning on Gutierrez's understanding of the sentencing guidelines, including attempting to question his understanding of the detailed mechanics of guideline calculations, the government again objected and, at sidebar, the district court probed whether the testimony would confuse the jury. Gutierrez then testified that he understood that his sentence was lower than the high-end of the sentencing guidelines range.

"[W]e consider de novo whether the strictures of the Confrontation Clause have been met." United States v. Díaz, 670 F.3d 332, 344 (1st Cir. 2012) (quoting United States v. Vega Molina, 407 F.3d 511, 522 (1st Cir. 2005)). Where there has been no violation of the Confrontation Clause, we review limitations placed on cross-examination for an abuse of discretion. United States v. Jiménez-Bencevi, 788 F.3d 7, 21 (1st Cir. 2015) (citing United States v. Martínez-Vives, 475 F.3d 48, 53 (1st Cir. 2007)). The Sixth Amendment's Confrontation Clause protects the right of defendants "to cross-examine witnesses who testify against them," United States v. Casey, 825 F.3d 1, 23-24 (1st Cir. 2016), within reasonable limits to avoid "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). A violation of the Confrontation Clause exists where a jury "might have received a significantly different

impression" of the witness's testimony or credibility if the defendant had been permitted full cross-examination. Id. at 680. See also United States v. Acevedo-Hernández, 898 F.3d 150, 168 (1st Cir. 2018) (applying the harmless error rule to admission of testimony).

We conclude that the district court did not err in limiting cross-examination to avoid Gutierrez testifying about the contents of the sentencing guidelines or his out-of-court conversations and to prevent potential juror confusion. See Shannon v. United States, 512 U.S. 573, 579 (1994) ("providing jurors sentencing information . . . creates a strong possibility of confusion" because the jury has "no sentencing function"). The district court's concern regarding the potential for juror confusion did not constitute an abuse of discretion. In fact, the court allowed Cruz-Rivera's questions on Gutierrez's possible bias because of his lower sentence through cooperation with the government. Defense counsel was still able to elicit Gutierrez's testimony about his understanding that his cooperation with investigators could result in a reduced sentence for his drug-trafficking offenses. Furthermore, in closing argument, Cruz-Rivera argued that the jury should not find Gutierrez's testimony credible, in part, because he knew that his cooperation with the government would result in him getting a lesser sentence. Thus, there was no harm to Cruz-Rivera because Gutierrez's potential

bias was exposed through this testimony even though Cruz-Rivera did not get to ask every question desired, therefore, Cruz-Rivera's Confrontation Clause argument fails.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) ("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.").  This result is not surprising in light of our decisions in similar cases.  See United States v. Luciano-Mosquera, 63 F.3d 1142, 1153 (1st Cir. 1995) (finding no Confrontation Clause violation where a district court limited testimony regarding sentencing); Jiménez-Bencevi, 788 F.3d at 21-22 (same).

We discern no abuse of discretion in the district court's limitation on Gutierrez's cross-examination by defendants.

### C.   Closing Argument

Third, Cruz-Rivera argues that the prosecutor in closing argument improperly made statements that referred to facts not in evidence.  According to Cruz-Rivera, the prosecutor made four erroneous statements to which he objected: (1) in describing Gutierrez's testimony, the prosecutor referred to a location associated with drug-dealing when Gutierrez's testimony indicated that the location named referred to an individual, (2) in using an audiovisual aide, the prosecution added a written caption to video evidence, (3) the prosecutor suggested the jury should interpret

translated recorded statements from Gutierrez regarding "the truck from there" as a reference to drugs coming from Puerto Rico, and (4) the prosecutor argued that, had defendants gone with Gutierrez to find a truck as Cruz-Rivera claimed, the surveillance team would have seen and testified to that fact when in fact one of the investigators testified that he did see Gutierrez leave the garage with two men during the surveillance. He contends that those statements were not harmless despite the district court's instruction that closing arguments are not evidence because of the credibility determinations the jury was required to make.

In making closing arguments, a prosecutor "cannot refer to facts not in evidence," but may "ask jurors to draw reasonable inferences from the evidence." United States v. Ponzo, 853 F.3d 558, 583 (1st Cir. 2017) (first citing United States v. Auch, 187 F.3d 125, 129 (1st Cir. 1999); then quoting United States v. Meadows, 571 F.3d 131, 145 (1st Cir. 2009)). Where a timely objection is lodged to a statement made by the government in closing argument, "[w]e review de novo whether the challenged portion of the government's closing argument was improper and, if so, whether it was harmful." United States v. González-Pérez, 778 F.3d 3, 19 (1st Cir. 2015) (alteration in original) (quoting United States v. Appolon, 695 F.3d 44, 66 (1st Cir. 2012)). That is to say, "we may reverse [the] convictions on the basis of the prosecutor's remarks only if they were 'both inappropriate and

prejudicial.'" United States v. Amaro-Santiago, 824 F.3d 154, 158 (1st Cir. 2016) (quoting United States v. Matías, 707 F.3d 1, 5 (1st Cir. 2013)). We have "fashioned a three prong test for examining whether the [remarks] 'so poisoned the well' that the trial's outcome was likely affected, thus warranting a new trial." United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999) (citing United States v. Capone, 683 F.2d 582, 586-87 (1st Cir. 1982)). "We examine: (1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case." Id. (citing United States v. Hodge-Balwing, 952 F.2d 607, 610 (1st Cir. 1991)). We thus review the challenged remarks under the three-pronged test.

First, while Cruz-Rivera identifies four statements by the prosecutor that he claims introduced facts not in evidence, we disagree with those characterizations. As to the first statement, regarding Gutierrez's reference to "Centro," which he claimed was a nickname for a person based on where that individual lived, the prosecutor's statement that Gutierrez "was talking about centro, not the center translation, but centro, a location, a place for drug dealing, a person," was a summary of Gutierrez's testimony that was not clearly incorrect in a way that rises to the level of introducing facts not in evidence. Similarly, the caption on the

video evidence was a summary of Gutierrez's testimony and did not constitute facts not in evidence.

As to the prosecutor's suggestion to the jury that it interpret Gutierrez's testimony regarding "the truck from there" as a reference to drugs coming from Puerto Rico, this was not a statement of facts not in evidence, or a statement of fact at all. Rather, the prosecutor was asking the jury to make an inference based on the evidence that was presented. This was not an error. See Ponzo, 853 F.3d at 583.

Finally, the prosecutor's contention that the jury should conclude that Gutierrez and defendants had not left the garage as Cruz-Rivera claimed based on the surveillance team's observations comes closest to introducing facts not in evidence. While the government's evidence ambiguously identified the presence of two trucks at the Union Street garages during the surveillance, the government addressed this confusion through additional questioning of the testifying officers to clarify that the surveillance team confirmed that the second truck spotted was not Gutierrez's as Cruz-Rivera claimed. Thus, even this statement is not clearly a misstatement of the facts in evidence. In any event, this one arguable misstatement was isolated, the district court instructed the jury that closing arguments were not evidence, and the statement was far from so poisoning the well as to warrant a new trial. See Joyner, 191 F.3d at 54. Because the statement

was harmless, we will not disturb the convictions on this basis.

### D.    District Court's Response to the Jury

Next, Jimenez argues that the district court incorrectly instructed the jury in response to a question asked during deliberations. After initially being instructed on the elements of conspiracy of and possession with intent to distribute at least one hundred grams of heroin, the jury asked two questions regarding conspiracy. Relevant here is the second question:

> If you are aware that money confiscated during a traffic stop is illegal drug money, and you participate in the attempted retrieval of the confiscated money, are you a willful participant in the conspiracy agreement?

In response, the district court instructed the jurors:

> [I]t's going to be very frustrating, and I apologize, but what I'm going to ask you to do -- well, first of all, the answer is it depends, okay. And that is not the answer that I think you wanted to hear, but it depends upon a bunch of things. It depends upon the facts as you have found them and taking these facts and applying them to the instructions on -- that I gave you on the crime of conspiracy.
> Okay. Now, I wish I could be more specific than that, but I can't because the instructions are an accurate recitation of the law, and you have to take those instructions and apply them to the facts as you find them to be.

Both before and after the district court answered the jurors' question, Jimenez objected and noted that his position was that "No" was the appropriate answer. On appeal, Jimenez argues that the answer of "it depends" was legally incorrect because it either

was an improper opinion on a hypothetical fact pattern or the district court erroneously instructed the jury that retrieval of the receipt for the cash confiscated during the traffic stop means that Jimenez was a co-conspirator to the narcotics crime.

When evaluating preserved challenges, we consider de novo whether the district court misstated the law and review for abuse of discretion whether the district court adequately explained the law. United States v. Monteiro, 871 F.3d 99, 114 (1st Cir. 2017); United States v. Symonevich, 688 F.3d 12, 24 (1st Cir. 2012).

We conclude that the district court did not misstate the law because the jury's question was inherently fact-bound. See United States v. Upton, 559 F.3d 3, 11 (1st Cir. 2009) ("Determining the contours of the conspiracy ordinarily is a factual matter entrusted largely to the jury."). An answer that waded into the facts would have impermissibly intruded on the jury's "constitutional responsibility" "to determine the facts" and "to apply the law to those facts." United States v. Gaudin, 515 U.S. 506, 514 (1995). The district court sufficiently explained to the jury that a finding of conspiracy depends on its factual findings and did not abuse its discretion in answering the jury's question. Rather, the district court correctly "exercise[d] caution" when answering a question that may have been dispositive to the jury's decision. United States v. Roberson,

459 F.3d 39, 46 (1st Cir. 2006).  Accordingly, we find no merit in the claim that the district court's response to the jury warrants disturbing the convictions.

### E.    Jimenez's Sentence

Finally, Jimenez argues that the district court erred in applying the mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(B)(i).  Section 841(b)(1)(B) mandates a five-year minimum sentence for any violation of section 841(a) involving one hundred grams or more of heroin.  At sentencing, the district court adopted the recommendation of the presentence report that Jimenez receive the mandatory minimum based on the jury's finding that Jimenez possessed or distributed one hundred grams or more of heroin.  On appeal, Jimenez argues that the district court erred in applying the mandatory minimum sentence because the verdict indicates that Jimenez was convicted on an aiding and abetting theory and, thus, lacked knowledge of the drug quantity.  In other words, Jimenez argues that he lacked the requisite mental state for application of the mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(B)(i).

Jimenez's argument cannot overcome binding precedent. In United States v. Collazo-Aponte, we held that drug quantity is not "an element of the offense to which the mens rea requirements should apply."  281 F.3d 320, 326 (1st Cir. 2002).  Instead, Section 841(b)'s "plain language" requires "the government to

prove only that the offense 'involved' a particular type and quantity of drug, not that the defendant knew that he was distributing that particular drug type and quantity." Id. (citing United States v. Sheppard, 219 F.3d 766, 768 n.2, 770 (8th Cir. 2000)). As we have noted, the law of precedent is a bedrock to our system of adjudication. See United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018). While that doctrine admits of exceptions in very limited circumstances, defendants' arguments based on subsequent Supreme Court cases, citing principally Rehaif v. United States, 139 S. Ct. 2191, 2195 (2019), Elonis v. United States, 135 S. Ct. 2001, 2009 (2015), and Alleyne v. United States, 570 U.S. 99, 114-15 (2013), do not "offer[] a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." Barbosa, 896 F.3d at 74.[3] Indeed, every other circuit to have considered whether section 841(b) required that a defendant have knowledge of the specific quantity has rejected that claim. See United States v. King, 345 F.3d 149, 152-53 (2d Cir. 2003) (per curiam); United States v. Barbosa, 271 F.3d 438, 457-58 (3d Cir. 2001); United States v. Brower, 336 F.3d 274, 276-77 (4th Cir. 2003); United States v. Gamez-Gonzalez, 319 F.3d 695, 699-700 (5th Cir. 2003)

_____

[3] As Jimenez notes, in a recent unpublished decision, a panel of this court rejected an argument that Collazo-Aponte should be revisited and overturned. See United States v. Mejía-Romero, 822 Fed. App'x 1, 3 (1st Cir. 2020) (unpublished).

(dictum); United States v. Villarce, 323 F.3d 435, 438-39 (6th Cir. 2003); United States v. Carrera, 259 F.3d 818, 830 (7th Cir. 2001); Sheppard, 219 F.3d at 768 n.2; United States v. Collazo, 984 F.3d 1308, 1326-29 (9th Cir. 2021) (en banc); United States v. Briseno, 163 F. App'x 658, 665-66 (10th Cir. 2006) (unpublished); United States v. Sanders, 668 F.3d 1298, 1310 (11th Cir. 2012) (per curiam); United States v. Branham, 515 F.3d 1268, 1275-76 (D.C. Cir. 2008).  We conclude that the holding of Collazo-Aponte, that "the government [must] prove only that the offense 'involved' a particular type and quantity of [a proscribed] drug, not that the defendant knew that he was distributing that particular drug type and quantity," controls our review of convictions on three drug-trafficking counts. 281 F.3d at 326.[4]  We affirm the district court's application of the mandatory sentencing guidelines on that basis.

### III. CONCLUSION

For the reasons stated above, the judgments of conviction are **affirmed**.

---

[4] Jimenez suggests that the jury's determination on the conspiracy count that one hundred grams of heroin was not foreseeable to him necessarily meant that he lacked requisite knowledge of the circumstances of the offense, and thus could not be liable as an aider and abettor on the substantive count. Therefore, he contends, the jury must have found him liable under a constructive possession theory.  We are not persuaded by this argument because under any theory of liability, the jury was not required to find that Jimenez had knowledge of the drug quantity.